**ORAL ARGUMENT REQUESTED**

**No. 26-1214**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his official capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his official capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

Defendants-Appellees.

---

On Appeal from the United States District Court for the District of Colorado
District Court Case No. 1:25-cv-01391 (Judge Gordon P. Gallagher)

---

**BRIEF FOR APPELLANT**

---

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SAMUEL B. GOLDSTEIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*

## TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED APPEALS

GLOSSARY

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUE .......... 3

STATEMENT OF THE CASE .......... 4

A. Federal Statutory Background .......... 4

B. Colorado and Denver's Sanctuary Policies .......... 8

C. Prior Proceedings .......... 11

SUMMARY OF ARGUMENT .......... 13

STANDARD OF REVIEW .......... 16

ARGUMENT .......... 16

THE DISTRICT COURT ERRED IN DISMISSING THE UNITED STATES' CHALLENGES TO THE SANCTUARY POLICIES .......... 16

A. The application of federal immigration law and the Supremacy Clause to the Sanctuary Policies reflects principles of cooperative federalism. .......... 17

B. The district court's Tenth Amendment analysis was flawed .......... 23

C. The district court's incorporation by reference provides no basis for affirming its judgment. .......... 33

CONCLUSION .......... 41

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

ADDENDUM

Memorandum Opinion and Order, Dkt. 72 (Mar. 31, 2026) ........................... A1

Final Judgment, Dkt. 73 (Mar. 31, 2026) ......................................................... A14

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Arizona v. United States*,
567 U.S. 387 (2012) ........ 4, 5, 6, 17, 19, 22, 28

*Bittner v. United States*,
598 U.S. 85 (2023) ........ 36

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ........ 21, 24, 31

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ........ 21, 27, 29

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ........ 17

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981) ........ 25

*Kearns v. Cuomo*,
981 F.3d 200 (2d Cir. 2020) ........ 28

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) ........ 35

*Lucas v. Turn Key Health Clinics, LLC*,
58 F.4th 1127 (10th Cir. 2023) ........ 16

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ........ 24, 25, 27, 30, 31, 32

*New York v. United States*,
505 U.S. 144 (1992) ........ 23

*New York v. U.S. Dep't of Just.*,
951 F.3d 84 (2d Cir. 2020) ........ 30, 31

*Nielsen v. Preap*,
586 U.S. 392 (2019) ........ 4, 5

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 16, 39

*Ocean Cnty. Bd. of Comm'rs v. Attorney Gen. of N.J.*,
8 F.4th 176 (3d Cir. 2021) .......... 30

*ONEOK, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) .......... 17

*Patel v. Garland*,
596 U.S. 328 (2022) .......... 35

*Printz v. United States*,
521 U.S. 898 (1997) .......... 24, 32

*Reno v. Condon*,
528 U.S. 141 (2000) .......... 26, 32

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 34, 40

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) .......... 12, 15, 29, 30, 33, 34, 35, 40

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .......... 26, 38, 40

*United States v. Locke*,
529 U.S. 89 (2000) .......... 27

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) .......... 12, 15, 33, 34, 35, 38, 40

*United States v. Texas*,
599 U.S. 670 (2023) .......... 5

*United States v. Washington*,
596 U.S. 832 (2022) .......... 17, 38

*Vasquez-Garcia v. Centurion, LLC*,
172 F.4th 1150 (10th Cir. 2026) .......... 23

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) .......... 23

**Constitution:**

U.S. Const. amend. X ........ 25

U.S. Const. art. I, § 8, cl. 4 ........ 4

U.S. Const. art. VI, cl. 2 ........ 16, 25

**Federal Statutes:**

Immigration and Nationality Act:
8 U.S.C. § 1101 *et seq.* ........ 4
8 U.S.C. § 1182(a)(2) ........ 4
8 U.S.C. § 1226(a) ........ 5, 18
8 U.S.C. § 1226(c) ........ 18
8 U.S.C. § 1226(c)(1) ........ 5
8 U.S.C. § 1226(c)(3) ........ 6, 18, 21
8 U.S.C. § 1226(d)(1)(A) ........ 7, 19
8 U.S.C. § 1226(d)(1)(B) ........ 7, 19
8 U.S.C. § 1227(a)(2) ........ 4
8 U.S.C. § 1229 ........ 4
8 U.S.C. § 1229a ........ 4
8 U.S.C. § 1231(a)(1)(A) ........ 5, 18, 21, 37
8 U.S.C. § 1231(a)(1)(B) ........ 6, 18, 21
8 U.S.C. § 1231(a)(2) ........ 5, 18
8 U.S.C. § 1231(a)(2)(A) ........ 6, 37
8 U.S.C. § 1231(a)(4)(A) ........ 6, 18, 28, 37
8 U.S.C. § 1231(a)(6) ........ 5
8 U.S.C. § 1305(a) ........ 37
8 U.S.C. § 1306(b) ........ 37
8 U.S.C. § 1324(a)(1)(A)(iii) ........ 27
8 U.S.C. § 1357(d) ........ 5, 18
8 U.S.C. § 1373(a) ........ 7, 15, 19, 28, 35, 37
8 U.S.C. § 1373(b) ........ 7, 19
8 U.S.C. § 1373(c) ........ 7, 19, 36
8 U.S.C. § 1644 ........ 7, 19, 29, 35

6 U.S.C. § 251(2) ........ 4

28 U.S.C. § 1291 ........ 3

28 U.S.C. § 1331 ........ 3

28 U.S.C. § 1345 .................................................................................................... 3

34 U.S.C. § 41307 .................................................................................................. 32

42 U.S.C. § 5779(a) ................................................................................................ 32

**Federal Regulations:**

8 C.F.R. § 287.7(a) ........................................................................................ 6, 18

8 C.F.R. § 287.7(d) ........................................................................................ 6, 18

**State Statutes:**

Colo. Rev. Stat. § 24-72-204(7)(b)(I) ..................................................................... 40

Colo. Rev. Stat. §§ 24-74-101–108 ........................................................................... 8

Colo. Rev. Stat. § 24-74-102(1) ................................................................................ 9

Colo. Rev. Stat. § 24-74-103(1) ................................................................ 9, 20, 38, 39

Colo. Rev. Stat. § 24-74-105(1) ............................................................................ 9, 20

Colo. Rev. Stat. §§ 24-74.1-101–103 ......................................................................... 8

Colo. Rev. Stat. § 24-74.1-102(3)(a)(VII) .............................................. 10, 22, 33, 39

Colo. Rev. Stat. §§ 24-76.6-101–103 ......................................................................... 8

Colo. Rev. Stat. § 24-76.6-102(2)(a) .......................................................................... 9

Colo. Rev. Stat. § 24-76.6-102(4) .............................................................................. 9

Colo. Rev. Stat. § 24-76.6-103(1)(a) ............................................................... 9, 20, 39

Colo. Rev. Stat. § 24-76.6-103(2) ................................................................. 10, 11, 39

Colo. Rev. Stat. § 24-76.6-103(3) ............................................................................ 10

Colo. Rev. Stat. §§ 24-76.7-101–103 ......................................................................... 8

**Local Ordinances:**

Denv. Exec. Order No. 142 ....................................................................................... 8

Denv. Rev. Mun. Code §§ 28-250–253 ........ 8

Denv. Rev. Mun. Code § 28-250(a)(1) ........ 8, 20

Denv. Rev. Mun. Code § 28-250(a)(4) ........ 9, 38

Denv. Rev. Mun. Code § 28-252(a) ........ 8, 20

Denv. Rev. Mun. Code § 28-252(b) ........ 10, 11, 39

Denv. Rev. Mun. Code § 28-253(b)(3) ........ 10, 39

Denv. Rev. Mun. Code § 28-253(c) ........ 9, 20, 21, 39

Denv. Rev. Mun. Code § 28-253(d) ........ 10, 11, 21, 33, 39

**Other Authorities:**

Fed. R. App. P. 4(a)(1)(B) ........ 3

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) ........ 7, 36

S. Rep. No. 104-249 (1996) ........ 37

## STATEMENT OF RELATED APPEALS PURSUANT TO CIRCUIT RULE 28.2(C)(3)

Counsel for the United States is not aware of any prior or related appeals.

**GLOSSARY**

| | |
|---|---|
| DHS | Department of Homeland Security |
| FBI | Federal Bureau of Investigation |
| ICE | Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |

## INTRODUCTION

In the Immigration and Nationality Act (INA), Congress established a comprehensive framework governing the apprehension, detention, and removal of aliens unlawfully in the United States. As part of that scheme, Congress extensively addressed the relationship between federal immigration enforcement and state and local criminal enforcement. Exercising its plenary and exclusive authority over aliens' presence in this country, Congress could have provided that the federal government would immediately remove aliens who have been subject to state or local criminal prosecutions. Instead, Congress permitted states and localities to subject aliens to their criminal-justice systems, but it required federal immigration agents to take custody of certain criminal aliens upon their release and promptly remove them after they have been adjudged removable. Congress thus presented states and localities with a choice: subject aliens to criminal prosecution and imprisonment in a manner that does not interfere with federal immigration enforcement, or decline to subject aliens to their criminal-justice systems at all.

Colorado and Denver seek to have it both ways. They have chosen to continue prosecuting and detaining aliens under state and local criminal laws. But rather than facilitate the orderly transfer of those aliens to federal custody at the end of any state or local sentence, the State and City have instead enacted a series of policies designed to make it more difficult for federal authorities to assume custody. For instance, they reject requests to notify federal immigration officials about when an alien will be

released and to maintain custody for a brief period to allow federal officials to arrange to assume custody; they deny federal officials access to secure areas of state and local jails to facilitate a safe transfer of custody; and they refuse to provide federal officials information such as an alien's home address so that federal agents can re-arrest the alien once the State or City has released them back into the community. Worse still, when federal immigration authorities request information about an individual from certain state and local officials, the State and City require those officials to tip off the subjects of those requests—further facilitating evasion of federal enforcement.

Under the Supremacy Clause, Colorado and Denver have no authority to deliberately obstruct the enforcement of federal law in this manner. The district court nonetheless dismissed the United States' complaint challenging these Colorado and Denver provisions. The court made no effort to analyze whether and to what extent the challenged provisions interfere with federal efforts to assume custody—or otherwise conflict with the federal immigration scheme. To the extent the court addressed the merits of the federal government's preemption and discrimination challenges at all, it did so only in a footnote stating that it "agree[d] with" and "adopt[ed]" the decisions of two other district courts upholding purportedly "similar" state and local laws—disregarding that some of the policies at issue here have no analogues in those other cases. Appx237 n.4.

The district court's dismissal instead rested almost entirely on its view that invalidating the challenged policies would commandeer the State and City's resources

in violation of the Tenth Amendment. But the anti-commandeering doctrine does not permit states to choose to use their resources in a way that interferes with federal law enforcement, as Colorado and Denver have done here. Indeed, in holding that the Tenth Amendment precluded all of the federal government's claims, the district court apparently held 8 U.S.C. §§ 1373(a) and 1644 unconstitutional without even recognizing that it was doing so. This Court should reverse the district court's judgment of dismissal, reject the district court's Tenth Amendment analysis, and remand for the district court to analyze the federal government's preemption and discrimination claims under the proper legal framework.

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1345. Appx16. The district court dismissed the United States' complaint and entered judgment on March 31, 2026. Appx238-239. The United States filed a timely notice of appeal on May 29, 2026. Appx240-241; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in dismissing the United States' complaint, which challenged on preemption and intergovernmental-immunity grounds Colorado and Denver provisions that were designed to thwart the enforcement of federal immigration law.

## STATEMENT OF THE CASE

### A. Federal Statutory Background

The Constitution grants the federal government the exclusive authority to establish a "uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Based on that authority and others, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the INA, 8 U.S.C. § 1101 *et seq.*, and related statutes, Congress has created an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395.

1. As part of this statutory framework, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Removal is a civil process initiated at the discretion of federal immigration officers. *Id.*; *see* 8 U.S.C. §§ 1229, 1229a. Aliens can be removed for multiple reasons, including having committed a specified crime. *See* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). The Department of Homeland Security (DHS)—mainly through its component agency, Immigration and Customs Enforcement (ICE)—is responsible for arresting and detaining aliens who are, or may be, subject to removal.[1]

[1] Congress has transferred enforcement of certain INA provisions from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. § 251(2); *Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019).

The INA "instructs when it is appropriate to arrest an alien during the removal process." *Arizona*, 567 U.S. at 407. When federal immigration officials decide to seek removal, they may issue an administrative warrant pursuant to which "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). For certain categories of aliens, such as aliens who have committed specified crimes, the Secretary "shall" detain the alien, *id.* § 1226(c)(1), subject to resource constraints and traditional exercises of prosecutorial discretion, *see United States v. Texas*, 599 U.S. 670, 680 (2023). This mandatory-detention requirement reflects Congress's "concern that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Preap*, 586 U.S. at 398 (alteration and quotation marks omitted). Moreover, once an alien has been adjudged removable, he generally must be removed within 90 days, 8 U.S.C. § 1231(a)(1)(A), and he is subject to mandatory detention—either "[d]uring the removal period" or, in certain circumstances, beyond, *id.* § 1231(a)(2), (6).

Aliens subject to federal immigration proceedings may also be targets of state or local criminal enforcement, and the INA contains multiple provisions governing the relationship between federal immigration enforcement and state or local criminal proceedings. The INA provides that DHS must take an alien who is "convicted of" certain crimes into custody, but only "when the alien is released." 8 U.S.C. § 1226(c)(1); *see also id.* § 1357(d) (authorizing immigration officials to take custody of

an alien who violated "any law relating to controlled substances" if the "alien is not otherwise detained by . . . State[] or local officials"). And an alien generally cannot be removed "until the alien is released" from state or local custody. *Id.* § 1231(a)(4)(A). Indeed, an alien with a final order of removal cannot even be detained before his release from custody. DHS "shall detain" an alien with an order of removal "[d]uring the [90-day] removal period," but if an alien "is detained or confined" by state or local authorities, that period starts only when "the alien is released." *Id.* § 1231(a)(1)(B)(iii), (2)(A).

To bridge the gap between the end of state or local custody and the beginning of federal custody, DHS officials may issue an immigration "detainer" requesting that a state or local agency advise DHS prior to an alien's release so that DHS can arrange to assume custody for the purpose of arresting and removing the alien. *See* 8 U.S.C. § 1226(c)(3); *see also* 8 C.F.R. § 287.7(a). A detainer may also request that the state or local agency "maintain custody of the alien for a period not to exceed 48 hours." 8 C.F.R. § 287.7(d). In certain circumstances, such as when an alien has committed a listed crime and is inadmissible on certain grounds, DHS "shall issue a detainer," and when the alien is no longer "detained by . . . State[] or local officials, shall effectively and expeditiously take custody of the alien." 8 U.S.C. § 1226(c)(3).

2. As reflected in these provisions allowing an alien to complete state criminal custody before removal, "[c]onsultation between federal and state officials" is an "important feature" of Congress's immigration framework. *Arizona*, 567 U.S. at 411.

Several other INA provisions likewise reflect Congress's judgment that information sharing between state and federal officials is critical to ensure that federal immigration authorities can fulfill their duties under the INA. For example, the federal government must make resources available to state and local authorities to help them determine whether individuals they have arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The INA also directs the federal government to designate liaisons with "State[] and local law enforcement and correctional agencies . . . with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." *Id.* § 1226(d)(1)(B). And if state or local officials "seek[] to verify or ascertain the citizenship or immigration status of any individual," the federal government must share the requested information. *Id.* § 1373(c).

At the same time, the INA ensures that state and local officials cannot block federal officials from receiving information pertinent to their immigration duties. Section 1373(a) provides that federal, state, and local government entities and officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar provisions). These provisions were intended to ensure that state and local officials retain "the authority to communicate with [federal immigration officials] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.).

### B. Colorado and Denver's Sanctuary Policies

This case involves Colorado state laws and Denver municipal ordinances (collectively, the Sanctuary Policies) that obstruct federal immigration enforcement in various ways.[2]

Several of the Sanctuary Policies undermine federal immigration authorities' ability to assume custody of aliens at the end of their state or local sentences. Denver broadly prohibits city agencies and employees from "us[ing] any city funds or resources to assist in the enforcement of federal immigration laws"—including by "[a]ssisting or cooperating" with any "detention[] or arrest procedures relating to alleged violations of the civil provisions of federal immigration laws." Denv. Rev. Mun. Code § 28-250(a)(1). Another Denver provision specifies that "federal immigration authorities shall not be granted access or allowed to use the secure areas of any city or county jail" for any "purpose related to the enforcement of federal immigration laws" absent a judicial warrant. *Id.* § 28-252(a). And both Denver and Colorado bar their respective law enforcement officers from "detain[ing] an individual

---

[2] The Sanctuary Policies challenged in the complaint here are Colorado House Bill 19-1124 (codified at Colo. Rev. Stat. §§ 24-76.6-101–103); Colorado Senate Bill 21-131 (codified at Colo. Rev. Stat. §§ 24-74-101–108 and other scattered provisions); Colorado House Bill 23-1100 (codified at Colo. Rev. Stat. §§ 24-76.7-101–103); Colorado Senate Bill 25-276 (codified at Colo. Rev. Stat. §§ 24-74.1-101–103 and other scattered provisions); Denver Ordinance No. 940-17 (codified at Denv. Rev. Mun. Code §§ 28-250–253); and Denver Executive Order No. 142.

solely on the basis of a civil immigration detainer." *Id.* § 28-253(c); *see* Colo. Rev. Stat. § 24-76.6-102(2)(a), (4) (similar).

Some of the Sanctuary Policies impede federal efforts to assume custody of aliens by prohibiting state and local officials from sharing information with federal immigration authorities. Colorado law provides that state and local employees may not disclose "personal identifying information . . . for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement" unless required by federal or state law or to comply with a court order. Colo. Rev. Stat. § 24-74-103(1). The statute defines "personal identifying information" to include a wide variety of information that can be used "to identify a specific individual," such as a person's "home or work addresses," "immigration or citizenship status," and "place of birth." *Id.* § 24-74-102(1). Where a third party accesses such personal identifying information through a state or local database, they must certify that they will neither use the information to "assist[] in federal immigration enforcement" nor disclose the information to "individuals or entities engaged in . . . federal immigration enforcement." *Id.* § 24-74-105(1). Other Colorado provisions impose similar information-sharing restrictions on specific state and local officials, such as probation and pretrial services officers. *Id.* § 24-76.6-103(1)(a). And Denver similarly prohibits city law enforcement officers from "provid[ing] any individual's personal information to federal immigration enforcement authorities" absent a judicial warrant. Denv. Rev. Mun. Code § 28-253(c); *see also id.* § 28-250(a)(4) (prohibiting use of city resources to

“[d]isseminat[e] information about the national origin, immigration or citizenship status of any individual except to the extent required by any federal, state or city law or regulation”).

Other Sanctuary Policies require state and local officials to tip off individuals about federal immigration enforcement efforts. Under Colorado law, certain state entities—such as public schools, libraries, and healthcare facilities—must adopt “[p]rocedures to communicate information, as appropriate, about a federal immigration authority’s request for information or access to the child, student, patient, or patron who was the subject of the request” or their family members. Colo. Rev. Stat. § 24-74.1-102(3)(a)(VII). Further, when Denver law enforcement receives a request from “federal immigration enforcement authorities” seeking notification of an individual’s release from city custody, Denver officials must “as promptly as practicable advise the inmate who is the subject of” that request. Denv. Rev. Mun. Code § 28-253(b)(3), (d). Moreover, both Colorado and Denver mandate that certain “advisement[s]” be given to state and local detainees before any “telephone or video interviews” with federal immigration authorities, as well as before those detainees are released from state or local custody. Colo. Rev. Stat. § 24-76.6-103(2)-(3); Denv. Rev. Mun. Code §§ 28-252(b), 28-253(d). The required advisements include statements that “[t]he interview is being sought by federal immigration authorities,” that the individual “has the right to decline the interview and remain silent,” and that the individual “has the right to speak to an attorney before submitting to the interview.”

Colo. Rev. Stat. § 24-76.6-103(2); *see* Denv. Rev. Mun. Code §§ 28-252(b), 28-253(d) (similar).

### C. Prior Proceedings

The United States brought this suit in May 2025 against the State of Colorado, the City and County of Denver, and related entities and officials. Appx17; *see* Appx5. The federal government's complaint asserts that Colorado and Denver's Sanctuary Policies violate the Supremacy Clause under preemption and intergovernmental-immunity principles. Appx37-38. For instance, the complaint alleges that the Sanctuary Policies "impede DHS's ability to readily obtain from local law enforcement the release date[s]" of criminal aliens and restrict "DHS's access to such aliens to facilitate the transfer of custody." Appx35. The Sanctuary Policies thus "frequently require federal immigration officers" to "engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody"—thereby "endangering immigration officers, the particular alien[s], and members of the public." Appx36.

The district court granted defendants' motions to dismiss the complaint for failure to state a claim. Appx225-237. The court acknowledged that the "Supremacy Clause undoubtedly prevents states from contradicting or obstructing the federal immigration scheme." Appx230. But the court concluded that the federal government's challenges to the Sanctuary Policies "fail[ed] to state claims upon which relief can be granted" because "any holding in favor of [the federal government] would run afoul of the Tenth Amendment." Appx230; Appx237.

The district court stated that a ruling invalidating the Sanctuary Policies would "conscript Colorado and Denver resources to implement the federal immigration scheme." Appx236. For instance, according to the court, enjoining the information-sharing restrictions would "compel Colorado and Denver to 'bear the expense' of the federal civil immigration scheme" by requiring them to "allow officials to spend time on the clock . . . sharing information with the Federal Government." Appx234. Similarly, the court concluded that invalidating the prohibitions on detaining individuals pursuant to immigration detainers would "force Colorado and Denver to bear the cost of enforcing the federal immigration scheme and remove their authority to determine the proper allocation of state resources." Appx234-235. And the court determined that an injunction against the provisions requiring state and local officials to tip off individuals about immigration enforcement efforts would "usurp control over Colorado and Denver officials by dictating what the officials can and cannot do." Appx236.

The district court viewed its Tenth Amendment holding as "dispositive" and stated that it "need not discuss" the merits of the federal government's preemption and intergovernmental-immunity claims. Appx237 & n.4. But in a footnote, the court indicated that it "agree[d] with the analysis" of the district courts in *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), and *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025)—which the court described as rejecting "similar" preemption and intergovernmental-immunity challenges to "substantially similar"

state and local laws. Appx237 n.4. The court here thus purported to "adopt[]" the "analysis and reasoning" of those decisions. Appx237 n.4.

## SUMMARY OF ARGUMENT

The Colorado and Denver provisions challenged here represent a concerted effort by the State and City to make it more difficult for federal immigration officers to enforce the immigration laws. Contrary to the district court's view, the Tenth Amendment does not authorize states and localities to adopt such policies.

A. Cooperative-federalism principles are central to the comprehensive framework Congress adopted to govern the apprehension, detention, and removal of unlawfully present aliens. Congress provided that aliens may not be removed while they are imprisoned based on a state or local criminal conviction. But Congress required federal immigration agents to detain criminal aliens after completion of their state or local sentences. And to facilitate a safe and orderly transfer of custody, Congress both authorized federal immigration authorities to issue detainer requests to state and local law enforcement agencies and enacted numerous provisions that promote information sharing between state and federal authorities. In particular, in 8 U.S.C. §§ 1373 and 1644, Congress prohibited states and localities from restricting their officials' ability to provide immigration status-related information to federal immigration authorities.

Colorado and Denver's Sanctuary Policies frustrate that cooperative scheme. After choosing to prosecute and imprison aliens under their criminal laws, the State

and City renege on their end of the INA's bargain by making it more difficult for federal authorities to assume custody. Worse, they affirmatively require certain state and local officials to inform individuals suspected of immigration violations when federal officials request information about them. As a result, immigration agents must undertake difficult efforts to re-arrest criminal aliens after their release from state or local custody—endangering the immigration agents, the aliens themselves, and members of the public. The Supremacy Clause does not countenance that state of affairs.

B. The district court failed to analyze whether and to what extent the Sanctuary Policies frustrate the federal scheme. Instead, the court concluded that invalidating the Sanctuary Policies would violate the Tenth Amendment anti-commandeering doctrine. It could do so only by adopting an implausibly broad conception of the doctrine, under which any preemption claim that would alter the conduct of state or local officials constitutes commandeering. That approach would essentially eliminate the Supremacy Clause.

Here, Colorado and Denver have voluntarily chosen to subject potentially removable aliens to their criminal-justice systems. There is no commandeering problem with requiring states and localities to do so in a manner that does not obstruct federal law enforcement. The Supreme Court has long recognized that state laws are not shielded from preemption merely because they regulate the conduct of state officials. Indeed, the Supreme Court has repeatedly held that cooperative-

federalism schemes—like the immigration framework at issue here—are fully consistent with the Tenth Amendment.

C. To the extent the district court engaged at all with the government's Supremacy Clause challenges, it merely purported to "adopt[]" the decisions of two other district courts that rejected "similar" challenges to "substantially similar" state and local laws. Appx237 n.4 (citing *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), and *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025)). That incorporation by reference provides no basis to affirm the district court's judgment of dismissal here. In rejecting the government's conflict-preemption challenges, the *Illinois* and *New York* courts determined that the INA does not require states to assist with federal immigration enforcement. But Illinois and New York—like Colorado and Denver here—are not just declining to regulate aliens subject to the federal immigration laws. They are instead choosing to exercise their criminal regulatory authority over such aliens, but doing so in a way that interferes with Congress's expectation of an orderly transfer of custody to the federal government at the end of the alien's state or local sentence.

Moreover, the *Illinois* and *New York* courts erred in concluding that 8 U.S.C. §§ 1373 and 1644 do not expressly preempt state information-sharing restrictions to the extent they bar sharing of information such as an alien's release date or home address. Such information is "information regarding the citizenship or immigration status" of an individual, *id.* § 1373(a), because it is relevant to whether an alien can—

and in some cases, must—be removed or whether the removal is prohibited. And those district courts incorrectly held that the challenged state policies do not impermissibly discriminate against the federal government. By imposing a unique burden on federal operations, such state policies single out federal immigration officials and treat them less favorably than other, non-federal law enforcement personnel.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of a complaint for failure to state a claim. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). In doing so, the Court "accept[s] a complaint's well-pleaded allegations as true, view[s] all reasonable inferences in favor of the nonmoving party, and liberally construe[s] the pleadings." *Id.*

## ARGUMENT

### THE DISTRICT COURT ERRED IN DISMISSING THE UNITED STATES' CHALLENGES TO THE SANCTUARY POLICIES

The Supremacy Clause makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. State and local laws "may run afoul of the Supremacy Clause in two distinct ways." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). The preemption doctrine bars state laws that Congress has preempted through "express language in a [federal] statute" or that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*ONEOK, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015) (quotation marks omitted). And the doctrine of intergovernmental immunity prohibits state policies that "directly regulate or discriminate against" the federal government. *United States v. Washington*, 596 U.S. 832, 835 (2022).

Yet the district court did not meaningfully analyze whether the Colorado and Denver policies challenged here are preempted or contravene intergovernmental-immunity principles. Instead, the court dismissed the federal government's complaint based on its erroneous conclusion that any ruling invalidating the Sanctuary Policies on these bases would violate the Tenth Amendment. This Court should reverse the district court's dismissal and remand for the district court to address the merits of the federal government's preemption and intergovernmental-immunity claims.

### A. The application of federal immigration law and the Supremacy Clause to the Sanctuary Policies reflects principles of cooperative federalism.

1. The Constitution grants the federal government plenary and exclusive "power over immigration, naturalization and deportation." *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). Exercising that authority, Congress has specified an "extensive and complex" framework governing aliens' entry, apprehension, detention, and removal. *Arizona v. United States*, 567 U.S. 387, 395 (2012).

As particularly relevant here, the INA recognizes that aliens unlawfully in the United States are subject to removal under federal immigration law and may also be subject to regulation under state and local criminal law. Addressing the intersection of

these two regulatory schemes, the INA permits states and localities to subject such aliens to their criminal justice systems, but it authorizes—and in some circumstances requires—federal immigration officials to take custody once state or local criminal custody has ended. The INA specifies that DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.* § 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" such aliens, and if the alien has a qualifying criminal history, "[u]nder no circumstance" shall DHS release the individual during the removal period. *Id.* § 1231(a)(2). Similarly, when an alien is not yet subject to a final order of removal, DHS may execute an administrative warrant to arrest and detain the alien when he is released from local criminal custody. *Id.* § 1226(a). If such an alien has a qualifying criminal history, DHS "shall" take the alien into custody "when the alien is released." *Id.* § 1226(c). And to bridge the gap between the end of state or local custody and the beginning of federal custody, Congress authorized DHS to issue immigration detainers requesting that state or local officials notify DHS prior to an alien's release and maintain custody for a short period to allow federal officials to arrange to assume custody. *See* 8 U.S.C. §§ 1226(c)(3), 1357(d); 8 C.F.R. § 287.7(a), (d).

To ensure that state and local criminal enforcement does not interfere with the federal scheme, Congress enacted several other provisions designed to further

facilitate cooperation between the states and the federal government. The federal government is responsible for making information available to state and local authorities to help those authorities determine whether individuals arrested for aggravated felonies are aliens. 8 U.S.C. § 1226(d)(1)(A). The federal government also designates and trains liaisons with states and localities in connection with aliens charged with aggravated felonies. *Id.* § 1226(d)(1)(B).

Other INA provisions require the federal government and the states to share information. The federal government must provide information, upon request, to state or local officials "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). Further, states and localities cannot "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also id.* § 1644 (similar); *id.* § 1373(b) (persons or agencies may not "prohibit, or in any way restrict, a Federal, State, or local government entity" from sending information regarding immigration status to DHS, requesting or receiving such information from DHS, maintaining such information, or exchanging such information with other government entities).

Altogether, these provisions reflect a comprehensive, cooperative scheme governing the regulation of aliens who may be of interest to both states and the federal government. *See Arizona*, 567 U.S. at 412 (observing that Congress "encouraged the sharing of information about possible immigration violations"

between states and federal immigration authorities). States are entitled to detain and prosecute aliens under state criminal laws—notwithstanding their eligibility for removal under federal law—if they choose to do so. Congress further contemplated that once the period of state custody has concluded, the alien will be transferred to federal custody. That process requires a certain degree of coordination between state and federal officials, including the free flow of information that is also expressly required by federal law.

2. The Sanctuary Policies disrupt this scheme of cooperative federalism. For instance, Colorado and Denver have each enacted a set of provisions that operate collectively with the purpose and effect of hindering federal immigration officers' ability to obtain custody through a safe and orderly transfer. Denver denies federal immigration agents access to secure areas of city jails for purposes of assuming custody or "any other purpose related to the enforcement of federal immigration laws." Denv. Rev. Mun. Code § 28-252(a). Indeed, Denver prohibits its agencies and employees from "assist[ing] in the enforcement of federal immigration laws" in any way—including by "[a]ssisting or cooperating" with "detention[] or arrest procedures" by federal immigration authorities. *Id.* § 28-250(a)(1). Both Colorado and Denver refuse to provide immigration authorities information they may need to re-arrest an alien who has been released from state or local custody, such as the alien's home address. Colo. Rev. Stat. §§ 24-74-103(1), 24-74-105(1), 24-76.6-103(1)(a); Denv. Rev. Mun. Code § 28-253(c). And both Colorado and Denver bar state and local officials

from complying with detainers requesting that those officials maintain custody of an alien to permit federal immigration agents to assume custody. Colo. Rev. Stat. § 24-76.6-102(2)(a), (4); Denv. Rev. Mun. Code § 28-253(c).

These provisions undermine Congress's expectation of seamless transfer of custody as expressed in numerous INA provisions, including those requiring federal officials to take custody of certain criminal aliens and effectuate their removal within 90 days of their release from state custody. *See, e.g.*, 8 U.S.C. §§ 1226(c)(3), 1231(a)(1)(A)-(B). As the federal government's complaint here alleges, these policies have "frequently require[d] federal immigration officers" to "engage in difficult and dangerous efforts to re-arrest aliens who were previously in local custody." Appx36. It is axiomatic that the federal government's ability to safely and effectively enforce federal law may not be "obscured by state or local action" in this way. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000); *see also City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system.").

Colorado and Denver compound the problem by affirmatively requiring state and local officials to tip off subjects of requests by federal immigration authorities. For example, when federal immigration authorities request notification before an alien is released from city custody, Denver officials must "as promptly as practicable" notify the alien about the request. Denv. Rev. Mun. Code § 28-253(d). And when

federal immigration officials request information from certain Colorado state entities—such as public schools, libraries, and healthcare facilities—those entities must notify the subject about the request "as appropriate." Colo. Rev. Stat. § 24-74.1-102(3)(a)(VII). It is difficult to imagine provisions that more clearly "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted). Imagine, for example, if the State or City imposed a similar requirement that applied to the Federal Bureau of Investigation (FBI). That is, whenever the FBI sought state or local cooperation with a criminal investigation, state or local authorities would tip off the target of that investigation. Colorado and Denver cannot seriously contend that such a state or local law would be permissible. The tip-off provisions are no more permissible in the immigration context.

3. This interference with the orderly operation of federal law cannot be reconciled with principles of conflict preemption, which applies when state or local enactments "create[] an obstacle to the full purposes and objectives of Congress" in enacting this scheme, *Arizona*, 567 U.S. at 410, or, in the case of the information-sharing restrictions, express preemption based on 8 U.S.C. §§ 1373 and 1644. But the district court did not meaningfully address the federal government's challenges on the merits. The court did not identify the "purposes and objectives of Congress" in enacting the INA's scheme governing the detention and removal of aliens who may also be subject to state or local criminal enforcement. *Id.* The court also failed to

analyze whether Colorado and Denver's Sanctuary Policies "functionally frustrate" the federal scheme. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1082 (10th Cir. 2025). Nor did the court resolve (or even acknowledge) disputes about the Sanctuary Policies' scope and operation that could bear heavily on the required analysis. For instance, the federal government contended that the Sanctuary Policies "prohibit state and local officers from releasing aliens into federal custody . . . after the alien's state or local custody has ended." Appx148-149; *see also* Appx36 (alleging that the Sanctuary Policies have "barr[ed] DHS access to aliens in state or local custody upon their release"). Colorado maintained that its laws "allow[] individuals to be released into ICE custody after their period of state detention for criminal justice purposes has ended." Appx193. But particularly on motions to dismiss—where the court must accept the plaintiff's "factual allegations as true and draw[] all reasonable inferences in [its] favor," *Vasquez-Garcia v. Centurion, LLC*, 172 F.4th 1150, 1162 (10th Cir. 2026)—the district court improperly rejected preemption without fully analyzing the extent to which they interfere with federal law.

**B. The district court's Tenth Amendment analysis was flawed.**

1. Rather than analyzing the government's preemption arguments, the district court dismissed the entire case based on a flawed understanding of Tenth Amendment anti-commandeering principles. The anti-commandeering doctrine prevents Congress from "directly compelling" states "to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 161 (1992) (quotation

marks omitted); *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474-75 (2018) (invalidating a federal statute that made it unlawful for state governmental entity to authorize sports gambling). It also prohibits Congress from "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 933-35 (1997) (invalidating federal statute that required state officials to conduct background checks for firearms purchasers).

The district court did not come close to demonstrating that the invalidation of every provision challenged in the complaint would violate these principles. The federal government does not seek to require Denver and Colorado to regulate in a particular area by enacting or repealing a particular law, as in *New York* and *Murphy*. Nor is preventing defendants from interfering with the federal government's own immigration enforcement equivalent to requiring the State and City to enforce a federal regulatory scheme, as in *Printz*. Congress directed federal immigration agents to enforce the federal immigration laws by arresting, detaining, and removing unlawfully present aliens, and the State and City have no constitutional right to inhibit the federal government's ability to do so. The Tenth Amendment does not give the states the right to "frustrate[] federal programs" in this way. *City of New York*, 179 F.3d at 35 (rejecting Tenth Amendment challenge to Section 1373's bar on state policies prohibiting information sharing with federal immigration authorities). Moreover, Congress may in some instances go beyond prohibiting states from interfering: it can require particular forms of state participation as a condition of the

state's voluntary choice to participate in a federal program. *See Murphy*, 584 U.S. at 476 (describing precedents upholding such "cooperative federalism" programs); *see also, e.g.*, *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288-89 (1981) (upholding program under which states had a choice between adopting state surface-mining regulations that follow federally mandated standards or leaving regulation of surface mining in the State to the federal government).

2. The district court misapprehended these settled principles in concluding that "any holding in favor of" the federal government on its Supremacy Clause challenges "would run afoul of the Tenth Amendment." Appx237. The Tenth Amendment "reserve[s] to the States" only those powers "not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. That reservation in no way disturbs the Supremacy Clause, which authorizes Congress to make "the supreme Law of the Land" and thereby prohibits states from usurping that authority. U.S. Const. art. VI, cl. 2; *see Hodel*, 452 U.S. at 289-90 (explaining that it is "incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce").

The district court's overarching error was its suggestion that any rule of federal law requiring states or localities to "expend their resources" in a particular way would violate the anticommandeering doctrine. Appx236-237; *see* Appx234-235 (similar). The Supreme Court has rejected the argument that the Tenth Amendment is violated whenever a federal law "will consume [state] employees' time and thus the State's

resources." *Reno v. Condon*, 528 U.S. 141, 150 (2000); *see also United States v. King County*, 122 F.4th 740, 758 (9th Cir. 2024) ("To the extent King County argues that it has expended resources ensuring the safety of [a local airport] in response to ICE charter flights, it identifies no case treating this degree of background support as rising to the level of unconstitutional commandeering."). When a state or locality "wish[es] to engage in certain activity," there is "no constitutional defect" in requiring them to "take administrative and sometimes legislative action to comply with federal standards regulating that activity." *Condon*, 528 U.S. at 150-51 (quotation marks omitted). That is the case here. As explained, Colorado and Denver have chosen to exercise their criminal regulatory authority over aliens who are also regulated by the federal immigration laws. Even if the State and City must expend some additional resources to regulate such aliens in a manner that avoids frustrating the federal scheme, that does not create a commandeering problem.

Moreover, some of the provisions at issue here would suffer no constitutional defect even under the district court's flawed framework. A decision invalidating the tip-off provisions, which affirmatively require state and local authorities to inform individuals suspected of immigration violations of the federal government's interest in them, could not plausibly be described as requiring defendants to "expend their resources." To the contrary, it is the challenged provisions that require the State and City to expend resources. In declining to invalidate those provisions, the district court suggested that any rule of federal law "dictating what [state and local] officials can and

cannot do" would violate the anti-commandeering doctrine. Appx236. This extraordinary position would wipe out wide swaths of Supremacy Clause jurisprudence, which as a general matter dictates what state and local officials can and cannot do.

It is well settled, for example, that the Tenth Amendment permits Congress to preempt state policies that "conflict with [a] federal law." *Murphy*, 584 U.S. at 477. The district court identified no authority supporting an exception for state policies governing the activities of state officials. In *Crosby*, for example, the Supreme Court invalidated a state law "restricting the authority of its agencies to purchase goods or services from companies doing business with Burma." 530 U.S. at 366. In *United States v. Locke*, 529 U.S. 89 (2000), the Court invalidated a state enactment that created a set of regulations, enforced by the state, regarding spills by oil tankers. In these and countless other examples, courts have considered preemption challenges that purport to authorize or prohibit state officials from taking action pursuant to challenged state laws, with no suggestion that the Tenth Amendment categorically prohibited the ordinary operation of Supremacy Clause principles.

To make matters worse, the district court's theory would render unconstitutional many federal statutes—such as the criminal prohibition on harboring aliens, 8 U.S.C. § 1324(a)(1)(A)(iii)—to the extent they proscribe conduct undertaken by state or local officials. If a state employee violated that prohibition—for instance, "alert[ing] undocumented immigrants to the physical approach of immigration

authorities," *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020)—it is beyond dispute that the federal government could prosecute the state employee without impermissibly commandeering the state. For much the same reasons, the Tenth Amendment does not shield from preemption a state policy—like the tip-off provisions here—directing its employees to violate or interfere with federal law.

The district court's analysis fares no better when applied to the provisions relating to transfer of prisoners. As explained above, the federal government has exclusive authority over the presence of aliens in the United States, including "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Congress thus could have directed federal authorities to immediately remove any removable alien convicted or even arrested by a state or locality while their location is known. But Congress instead decided to allow states to subject aliens to their criminal-justice systems, at least insofar as they face imprisonment. *See* 8 U.S.C. § 1231(a)(4)(A) (providing that federal authorities "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"). In allowing states to do so, Congress imposed certain conditions, including that states not use their criminal-justice systems to obstruct federal immigration enforcement. If Congress had expressly required that states assume custody of removable aliens only upon agreeing to certain requirements, there would be no plausible claim of commandeering. The Tenth Amendment analysis does not change merely because—except in the case of information sharing, *see id.* §§ 1373(a),

1644—these conditions are implicit in the federal scheme rather than express. *See Crosby*, 530 U.S. at 387-88 ("A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply . . . .").

Simply put, Congress presented states and their political subdivisions with a choice: (1) subject aliens to their criminal-justice systems in a way that does not obstruct federal immigration enforcement or (2) do not subject aliens to their criminal-justice systems at all. Rather than choosing one of these two options, however, Colorado and Denver are trying to have it both ways by subjecting aliens to their criminal-justice systems while simultaneously obstructing federal immigration enforcement. The Constitution does not give them that choice.

3. The district court's Tenth Amendment analysis made no mention of the federal government's express-preemption claims based on Sections 1373(a) and 1644. Yet in dismissing the government's entire complaint on Tenth Amendment grounds, *see* Appx236-237, the court effectively held those federal statutes unconstitutional without even acknowledging that it was doing so, underscoring the cursory and blunderbuss nature of its analysis.

To the extent the district court here intended to "adopt[]," Appx237 n.4, the *Illinois* district court's holding that "§§ 1373 and 1644 are not valid preemptive provisions," 796 F. Supp. 3d at 524-25—and to the extent that the *Illinois* court's cryptic statement itself purports to invalidate two Acts of Congress—that conclusion

does not withstand scrutiny. The *Illinois* district court declared Sections 1373(a) and 1644 "in tension with the Tenth Amendment" based on its view that those statutes "regulate States and local governments" rather than "private actors." *Id.* at 523, 525; *see also Ocean Cnty. Bd. of Comm'rs v. Attorney Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021) (relying on similar reasoning in rejecting preemption claims). But that conclusion disregards the Supreme Court's admonition in *Murphy* that "it is a mistake to be confused by the way in which a preemption provision is phrased." 584 U.S. at 478. After all, "language might appear to operate directly on the States" but in substance merely prevents the states from obstructing federal regulation of private parties. *Id.*

Here, Congress has enacted immigration laws that "impose[] restrictions or confer[] rights on private actors," *Murphy*, 584 U.S. at 477—specifically, laws defining which aliens are subject to federal detention (removable and criminal aliens) and the procedures by which federal officials are to take them into custody (which require cooperation from state and local governments). Considering their place in this broader statutory scheme, Sections 1373(a) and 1644 are part of the INA's regulation of the detention and removal of aliens—a regulatory system that "certainly confers rights and places restrictions on large numbers of private persons." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 114 n.27 (2d Cir. 2020). Colorado and Denver also "confer[] rights or impose[] restrictions" on the same private actors by subjecting them to the State and City's criminal-justice systems but then adopting conflicting procedures for their detention and release (prohibiting the sharing of information to

facilitate federal arrest). *Murphy*, 584 U.S. at 477. Accordingly, "the federal law takes precedence and the state law is preempted." *Id.* The "anticommandeering rule" presents no obstacle to that routine application of preemption principles. *Id.* at 480.

The Second Circuit thus correctly rejected a Tenth Amendment challenge to Section 1373(a) in *City of New York*, 179 F.3d 29. That case involved a New York City ordinance restricting local officials from "transmitting information regarding the immigration status of any individual to federal immigration authorities." *Id.* at 31. To avoid Section 1373(a)'s preemptive effect, the city argued that Section 1373(a) violates the anti-commandeering doctrine. *Id.* at 33. The Second Circuit rejected that claim, explaining that the commandeering prohibition does not displace Supremacy Clause principles "bar[ring] states from taking actions that frustrate federal laws and regulatory schemes." *Id.* at 35. To the contrary, "the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs" cannot be turned "into a sword allowing states and localities to . . . frustrate[] federal programs." *Id.* And after *Murphy*, the Second Circuit declined to adopt the State of New York's argument that *City of New York*'s holding "does not survive" the Supreme Court's decision in *Murphy*, concluding that it "does not follow" from *Murphy* that "[Section] 1373, on its face, violates the Tenth Amendment." *New York*, 951 F.3d at 112-13.

For much the same reasons, Colorado and Denver cannot use the anti-commandeering doctrine to avoid preemption under Sections 1373(a) and 1644. A

ruling invalidating the State and City's information-sharing restrictions would not amount to a "direct command to the States" to enact or administer a particular law or enforce a federal regulatory scheme. *Murphy*, 584 U.S. at 480. Rather, having voluntarily chosen to subject removable aliens to their criminal-justice systems, the State and City would merely be prohibited from exercising their criminal regulatory authority in a manner that frustrates the federal government's ability to assume custody at the end of the alien's state or local sentence. The Tenth Amendment poses no obstacle to that result.

In addition, even if a ruling invalidating those provisions would "require" state and local officials to "shar[e] information with the Federal Government," Appx234, there would still be no commandeering problem. In *Printz*, although the Supreme Court held that local law enforcement officers could not be required to perform background checks to validate the legality of gun sales under federal law, it distinguished statutes that "require only the provision of information to the Federal Government." 521 U.S. at 918. Such laws "do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Id.* The Supreme Court's Tenth Amendment cases thus are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a), transferred to 34 U.S.C. § 41307); *see also Condon*, 528 U.S. at 151 (explaining that the Tenth

Amendment permits federal enactments that do "not require the States in their sovereign capacity to regulate their own citizens" but instead "regulate[] the States as the owners of data bases").

### C. The district court's incorporation by reference provides no basis for affirming its judgment.

To the extent the district court engaged at all with the government's Supremacy Clause arguments, the court merely stated that it "agree[d] with the analysis" of two other district courts that rejected "similar" preemption and intergovernmental-immunity challenges to "substantially similar" state and local laws. Appx237 n.4 (citing *Illinois*, 796 F. Supp. 3d 494, and *New York*, 810 F. Supp. 3d 329). That approach was deficient in multiple respects.

1. To start, the district court was wrong to treat Colorado and Denver's Sanctuary Policies as coextensive with the laws challenged in *Illinois* and *New York*. Those cases involved restrictions on transferring aliens to federal custody, sharing certain information with federal immigration authorities, and arresting aliens in certain locations. *See Illinois*, 796 F. Supp. 3d at 506; *New York*, 810 F. Supp. 3d at 336. But some of the Sanctuary Policies here have no parallel to the laws at issue in *Illinois* and *New York*—such as the provisions requiring state and local officials tip off the subjects of federal immigration officials' requests for information. *See* Colo. Rev. Stat. § 24-74.1-102(3)(a)(VII); Denv. Rev. Mun. Code § 28-253(d). The district court thus

entirely failed to analyze the federal government's Supremacy Clause challenges to these provisions.

2. Regardless, to the extent the district court here purported to incorporate by reference the *Illinois* and *New York* opinions, *see* Appx237 n.4, its reasoning suffers from the same flaws as those decisions.[3]

a. The *Illinois* and *New York* courts rejected conflict-preemption claims based on their view that the INA "permi[ts]" states and localities "not to assist federal immigration enforcement." *New York*, 810 F. Supp. 3d at 351; *Illinois*, 796 F. Supp. 3d at 529, 531 (similar); *see also United States v. California*, 921 F.3d 865, 887-88 (9th Cir. 2019) (relying on similar reasoning to reject similar preemption argument). But as the foregoing discussion makes clear, Colorado and Denver are not merely sitting on the sidelines here. In the INA, Congress has offered states and localities the choice to subject removable aliens to their criminal-justice systems, but Congress contemplated a seamless transfer of custody to federal immigration officials at the end of any state or local criminal sentence. By choosing to prosecute and detain criminal aliens—but then exercising their criminal regulatory authority in a way that facilitates evasion of federal immigration enforcement—Colorado and Denver are affirmatively obstructing the federal scheme.

[3] The United States has appealed the dismissals of its complaints in *Illinois* and *New York*. *See United States v. Illinois*, No. 25-2904 (7th Cir.); *United States v. New York*, No. 26-104 (2d Cir.).

b. The district court likewise erred to the extent it concluded that the challenged information-sharing restrictions are not "express[ly] . . . preempt[ed]," Appx237 n.4, because 8 U.S.C. §§ 1373 and 1644 "only pertain[] to information regarding a person's legal classification under federal law," *Illinois*, 796 F. Supp. 3d at 519; *see New York*, 810 F. Supp. 3d at 349-50 (similar). Section 1373(a) provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1644 (similar). The information that Colorado and Denver apparently seek to shield—such as an alien's release date and home address—constitutes "information regarding . . . immigration status."

Congress chose to expand the scope of Sections 1373(a) and 1644 beyond legal classifications of citizenship or immigration status. States and localities are forbidden from imposing restrictions on the ability to share any "information *regarding* . . . citizenship or immigration status" with federal immigration authorities. 8 U.S.C. § 1373(a) (emphasis added). By using the word "regarding," Congress intended a "broadening effect, ensuring that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Patel v. Garland*, 596 U.S. 328, 339 (2022) (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). At

minimum, this must include facts that bear on an individual's citizenship or immigration status.

The statutory structure confirms as much. In the same section, Congress required DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in subsection (c) underscores the need to give effect to the breadth that word carries in subsection (a). *See Bittner v. United States*, 598 U.S. 85, 94 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning . . . ."). Congress must have intended Section 1373(a) to reach information beyond a person's legal status.

Consideration of legislative history would only reinforce the point. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.). These provisions were thus "designed to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS." *Id.* Likewise, the Senate Report accompanying Section 1373 explained that the "acquisition, maintenance, and exchange of immigration-related information

by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996).

Properly understood, Section 1373(a) expressly preempts prohibitions on state or local officials providing to ICE information like an alien's release date from state or local custody or home address. The INA provides that an alien with a final order of removal cannot be removed "until [he] is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). That is, such an alien is a removable alien but is authorized to be in the country in a state or local prison. But upon his release, that authorization terminates and his right to stay in the country changes—he can no longer stay in the United States and must be detained by federal immigration authorities while his removal is being effectuated. *See id.* § 1231(a)(1)(A), (2)(A). Likewise, other information such as an alien's home address is relevant to whether an alien's presence is lawful or whether he is subject to removal. *See id.* §§ 1305(a), 1306(b) (failure to notify the federal government of a new address subjects an alien to mandatory detention and removal). Such information governing whether and when an alien is subject to removal from the United States is plainly "information regarding . . . immigration status." *Id.* § 1373(a).

Nor does it matter that some of the challenged information-sharing restrictions specify that their prohibitions do not apply when disclosure is "required by federal . . .

law," Colo. Rev. Stat. § 24-74-103(1), or "to the extent required by any federal . . . law . . . including by way of example 8 U.S.C. § 1373 and 8 U.S.C. § 1644," Denv. Rev. Mun. Code § 28-250(a)(4). *See New York*, 810 F. Supp. 3d at 350 (relying on a similar carveout in rejecting preemption claim). The State and City cannot escape preemption by referring to federal law and then adopting an improperly narrow interpretation of that law, such as by taking the position in this litigation that they may prohibit their officials from sharing information such as an alien's "release date" and "contact information." *See* Appx51-52 (quotation marks omitted). Whether these provisions are preempted or permit the provision of this information as a matter of state or local law, it is impermissible for the State and City to adopt policies banning the sharing of this information.

c. Finally, the district court erred insofar as it "adopt[ed]" the *Illinois* and *New York* courts' rejection of the federal government's "discrimination claim[s]." Appx237 n.4. The intergovernmental-immunity doctrine bars state and local policies that "discriminate against the Federal Government." *Washington*, 596 U.S. at 838 (alteration and quotation marks omitted). "[A] state law discriminates against the Federal Government . . . if it singles [it] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Id.* at 839 (alteration, citation, and quotation marks omitted).

Many of the Sanctuary Policies "explicitly treat[]" federal immigration agents "differently from" other law enforcement personnel. *King County*, 122 F.4th at 757

(quotation marks omitted). The information-sharing restrictions prohibit state and local officials from disclosing information only "to federal immigration authorities." Colo. Rev. Stat. § 24-76.6-103(1)(a); *see also, e.g.*, *id.* § 24-74-103(1) (barring disclosure of information only "for the purpose of investigating for, participating in, cooperating with, or assisting in federal immigration enforcement"); Denv. Rev. Mun. Code § 28-253(c) (forbidding provision of personal information only "to federal immigration enforcement authorities"). They do not bar sharing information with any other law-enforcement agencies—such as those of other states or localities—or with members of the general public. Thus, on their face, these policies impermissibly single out the federal government for less favorable treatment.

Similarly, Colorado and Denver's tip-off provisions are triggered only by requests for information from "a federal immigration authority[]." Colo. Rev. Stat. § 24-74.1-102(3)(a)(VII); *see also, e.g.*, Denv. Rev. Mun. Code § 28-253(b)(3), (d) (requiring notice to the subject of a request "issued by federal immigration enforcement authorities"); Colo. Rev. Stat. § 24-76.6-103(2) (mandating that certain advisements be given before interviews with "federal immigration authorities"); Denv. Rev. Mun. Code § 28-252(b) (same). State and local officials need not tip off the subjects of requests by law-enforcement officials from other states or localities. These policies thus impose a burden unique to the federal government based on the "status" of federal immigration officials as federal immigration officials. *North Dakota*, 495 U.S. at 438 (plurality opinion).

As with the federal government's preemption challenges, the district court did not meaningfully address the merits of the government's discrimination claims. The court stated only that it "agree[d] with" the district court decisions in *Illinois* and *New York* concluding that the federal government "failed to identify a valid comparator as needed for its discrimination claim[s]." Appx237 n.4; *see Illinois*, 796 F. Supp. 3d at 533-34; *New York*, 810 F. Supp. 3d at 353-54. But it is not difficult to imagine that other law enforcement agencies may desire information like an alien's release date or address to support an investigation or prosecution under state or local law. Indeed, Colorado law expressly recognizes that "law enforcement agenc[ies]" may be interested in Colorado records such as driver's license applications—and permits a "state[] or local agency" to inspect such records but denies requests made for purposes of "federal immigration enforcement." Colo. Rev. Stat. § 24-72-204(7)(b)(I). By authorizing state and local officials to share such information with these law enforcement agencies—but denying the same information to federal immigration authorities—the Sanctuary Policies provide a comparator by its own terms.

Nor can Colorado and Denver justify their discrimination by asserting that "only the federal government enforces civil immigration law." *Illinois*, 796 F. Supp. 3d at 534. State and local laws "violate[] the anti-discrimination principle of the intergovernmental immunity doctrine" if they "burden[] federal operations, and *only* federal operations." *King County*, 122 F.4th at 757 (quotation marks omitted); *see also California*, 921 F.3d at 882 (concluding that state law was discriminatory because it

"relate[d] exclusively to federal conduct," namely, immigration detention). The State and City cannot discriminate against the federal government by identifying activities in which only the federal government engages any more than they could expressly discriminate against the federal government by name.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*s/ Samuel B. Goldstein*

SAMUEL B. GOLDSTEIN
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-0718*
*samuel.b.goldstein@usdoj.gov*


August 2026

## REQUEST FOR ORAL ARGUMENT

The United States respectfully requests oral argument. This case involves constitutional challenges to state and local policies that interfere with the federal government's enforcement of the immigration laws. Oral argument would facilitate the Court's consideration of the case.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9977 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Samuel B. Goldstein*
Samuel B. Goldstein

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that (1) all required privacy redactions have been made; (2) any paper copies to be submitted to the Court will be exact copies of the version filed electronically; and (3) the electronic submission was scanned for viruses and found to be virus-free.

*s/ Samuel B. Goldstein*
Samuel B. Goldstein

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 25-cv-01391-GPG-KAS

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF COLORADO,
JARED POLIS, Governor of Colorado, in his official capacity,
COLORADO GENERAL ASSEMBLY,
PHILIP WEISER, Attorney General of Colorado, in his official capacity,
CITY AND COUNTY OF DENVER,
DENVER CITY COUNCIL,
MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity,
DENVER SHERIFF DEPARTMENT, and
ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

Before the Court are three motions: Motion to Dismiss by State of Colorado, Governor Jared Polis, and Attorney General Philip Weiser (D. 37); Defendant Colorado General Assembly's Motion to Dismiss Plaintiff's Claims Against it Pursuant to Fed.R.Civ.P. 12(b)(6) (D. 38); and City and County of Denver's Motion to Dismiss First Amended Complaint (D. 39). The Court GRANTS all three motions for the following reasons.

## I. BACKGROUND

This civil action arises from the enactment of state and local so-called "sanctuary laws" in Colorado (D. 31).[1] Plaintiff, the United States of America, challenges four enacted Colorado state bills (House Bill 19-1124, Senate Bill 21-131, Senate Bill 21-1100, and Senate Bill 25-276) and two Denver municipal laws (Denver Executive Order No. 142 and Denver Ordinance No. 940-17) that, broadly speaking, limit the use of state resources for federal immigration enforcement purposes and seek to protect the rights and personal information of immigrants in Colorado. Plaintiff argues that, because the Constitution vests supreme authority over immigration in the Federal Government, these laws violate the Supremacy Clause of the U.S. Constitution (D. 31). Count one asserts that the challenged laws are both implicitly and expressly preempted by federal immigration laws (*id.* at ¶¶ 89–92). Count two asserts that the challenged laws unlawfully discriminate against the Federal Government by "singl[ing] out federal immigration officials, expressly and implicitly, for unfavorable and uncooperative treatment" (*id.* at ¶ 95). Count three asserts that Defendants' enforcement of the challenged laws impermissibly "effects direct regulation of the Federal Government" (*id.* at ¶ 99).

Defendants – the State of Colorado, Jared Polis, the Colorado General Assembly, Philip Weiser, the City and County of Denver, Denver City Council, Mike Johnston, the Denver Sheriff Department, and Elias Diggins – filed three separate motions to dismiss Plaintiff's claims (D. 37; D. 38; D. 39). Defendants argue that the laws are not implicitly or expressly preempted by federal law, Plaintiff has failed to identify a comparator for its discrimination claim, and the complaint fails to state how Defendants are directly regulating the Federal Government, instead relying on

[1] In its complaint, Plaintiff refers to the challenged laws as the "Sanctuary Laws" (D. 31 at ¶ 3).

conclusory statements (D. 37; D. 39). Defendants also argue that Plaintiff's overall proposed interpretation and application of the Supremacy Clause violates the Tenth Amendment of the U.S. Constitution (D. 37 at 22; D. 39 at 12).

## II. THE CHALLENGED LAWS

Plaintiff challenges each of the named state and local laws in their entirety, but its arguments focus on provisions falling into three general categories: (1) limitations on state and local collection and disclosure of individuals' personal information for federal immigration enforcement purposes; (2) limitations on state and local detention of individuals for federal immigration enforcement purposes; and (3) limitations on state and local officials facilitating federal immigration official access to state and local facilities and individuals detained in state and local facilities.

### A. Limitations on state collection and disclosure of individuals' personal information for federal immigration enforcement purposes

The challenged state laws prohibit state probation offices from providing individuals' personal information to federal immigration authorities (C.R.S. § 24-76.6-103); prohibit state agencies from disclosing or making accessible personal identifying information for federal immigration enforcement purposes (C.R.S. §§ 24-74-103–107); and impose limitations on state agency collection of personal identifying information and third party access to state agency records (*id.*). The terms "personal information" and "personal identifying information" as they are used in these laws refer to information that may be used to identify a specific individual, such as name, date of birth, social security number, home or work contact information, and family or emergency contact information. C.R.S. §§ 24-76.6-101 and 24-74-102(1). Denver Executive Order No. 142

ordered the Denver Sheriff Department to stop seeking federal funds that require gathering and disseminating national origin, immigration, or citizenship status information of individuals held in Denver jails. The Executive Order also ordered the City Attorney's Office to educate and train city employees on the limitations around collecting and sharing personal information with federal immigration enforcement officials, in line with state and local laws.

**B. Limitations on state and local detention of individuals for federal immigration enforcement purposes**

The challenged laws prohibit both state and local law enforcement officials from arresting or detaining individuals on the basis of a civil immigration detainer or administrative warrant[2] – i.e. without a judicial warrant. C.R.S. § 24-76.6-102; Denver Revised Municipal Code § 28-253(d). Detaining includes denying or delaying an individual's release from custody. C.R.S. § 24-76.6-102(2)(a). The state laws also prohibit state governmental entities from entering into or renewing agreements to detain individuals for federal civil immigration purposes; prohibit state governmental entities from entering into agreements to detain individuals in privately owned or operated immigration detention facilities; and limit the allocation of state funds to privately owned immigration detention facilities. C.R.S. §§ 24-76.7-101–103. The Denver Revised Municipal Code §§ 28-250, 28-251 (Denver City Ordinance) also prohibits the use of city funds or resources to assist in the enforcement of federal immigration laws as well as any contractual agreement

[2] A civil immigration detainer is a "request" that state or local law enforcement advise the Department of Homeland Security (DHS) prior to releasing someone in their custody so that DHS can arrange to assume custody. 8 C.F.R. § 287.7(a). "DHS may also request, but not require, that custody be extended by a period not to exceed 48 hours, 'in order to permit assumption of custody by the Department'" (D. 31 at ¶ 29 (quoting 8 C.F.R. § 287.7(d)). An administrative warrant is a grant of authority to federal immigration officers to arrest and detain an individual pending a decision on whether the individual is to be removed from the United States. 8 U.S.C. § 1226(a). Unlike a criminal warrant, it is not signed by a federal judge or magistrate judge. *See id.*

involving the city that would commit any employee to assist in the enforcement of federal immigration laws. Denver Revised Municipal Code §§ 28-250, 28-251.

**C. Limitations on state employees facilitating federal immigration official access to state and local facilities and individuals detained in state and local facilities**

On both a state and local level, the challenged laws require that before a state or local law enforcement official may coordinate an interview between federal immigration authorities and an individual incarcerated in a state jail or custodial facility, the detained individual must be advised that the interview is being sought by federal immigration authorities, the individual has the right to decline, remain silent, and speak to an attorney, and anything the individual says may be used against him or her in subsequent proceedings, including in federal immigration court. C.R.S. § 24-76.6-102; Denver City Ord. No. 940-17. The Denver Ordinance further bars federal immigration authorities access to city and county jails "for the purpose of conducting investigative interviews or any other purpose related to the enforcement of federal immigration" without a judicial warrant.

## III. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*,

478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge [the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citation modified).

## IV. ANALYSIS

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause undoubtedly prevents states from contradicting or obstructing the federal immigration scheme, *Arizona v. United States,* 567 U.S. 387, 407 (2012), but it does not go so far as to compel state assistance. The decision to implement the federal immigration scheme is reserved to the states according to the Tenth Amendment of the U.S. Constitution. *See Printz v. United States*, 521 U.S. 898, 925 (1997). However, the basis for Plaintiff's claims is an interpretation of Congress's authority to regulate immigration that would compel state assistance. Therefore, the Court finds that Plaintiff fails to state claims upon which relief can be granted. *See United States v. Illinois,* 796 F.Supp.3d 494, 532 (N.D. Ill. 2025) (holding that similar state

"sanctuary laws" in Illinois are protected by the Tenth Amendment, "even if those policies frustrate the federal government's civil immigration efforts."); *United States v. New York*, 810 F. Supp. 3d 329, 355 (N.D.N.Y. 2025) (holding that similar "sanctuary laws" in New York reflected the state's "decision to not participate in enforcing civil immigration law – a decision protected by the Tenth Amendment . . . Finding that these same provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment.") (hereafter, *New York N.D.N.Y*).

The Tenth Amendment declares all "powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. Thus, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 505 U.S. 144, 156 (1992) (hereafter, *New York*). In the Tenth Circuit, courts begin a Tenth Amendment analysis by determining "if the authority to act has been delegated by the Constitution to Congress." *Bd. of Cnty. Comm'rs, Fremont Cnty., Colorado v. United States E.E.O.C.*, 405 F.3d 840, 847 (10th Cir. 2005) (quoting *Kansas v. United States,* 214 F.3d 1196, 1198 (10th Cir. 2000). If the answer is yes, then Congress may act pursuant to Article I, but if the answer is no, then the power is deemed to have been reserved to the states. *Id.*

The Constitution confers upon Congress "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona,* 567 U.S. at 394. "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,'

Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* Pursuant to this authority, the Federal Government has enacted an extensive statutory and regulatory scheme for the governance of immigration status, which includes inspection, investigation, arrest, detention, and removal of individuals found to be unlawfully present in the United States. *See id.* at 395; 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. Nothing in this Order pretends to affect that complex regulatory scheme.

However, as the Supreme Court has recognized, the Constitution does not confer upon Congress the power to compel states to implement federal regulatory programs. *Printz,* 521 U.S. at 925 ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."). Our nation was founded on a system of "dual sovereignty" in which "citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Id.* at 928 (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). To preserve such a system, state legislatures must necessarily be free to govern according to the interests and will of their constituents, not Congress. *See id.* at 920 ("The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens."); *New York,* 505 U.S. at 162 ("While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."); *Murphy v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 471 (2018) ("[C]onspicuously absent from the list of powers given to Congress [in the Constitution] is the power to issue direct orders to the governments of the States."). And at the heart of representative governance is the "allocation of

scarce resources among competing needs and interests." *Alden v. Maine,* 527 U.S. 706, 751 (1999) ("Today, as at the time of the founding, the allocation of scarce resources among competing needs and interests lies at the heart of the political process."). If Congress were authorized to dictate the allocation of state resources, the balance of power contemplated by our Constitution would be upended. *Id.* ("When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government."). Therefore, it is clearly established that Congress does not have the power to dictate the allocation of state resources, such as by compelling states to bear the cost of enforcing a federal regulatory program. As the Supreme Court stated in *New York,* "[i]f state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program." 505 U.S. at 168.

According to these principles, state implementation and enforcement of the federal immigration scheme is necessarily voluntary. This conclusion is further supported by the language and text of the federal immigration laws that Plaintiff cites in its complaint. For example, federal law permits the federal government to contract with state and local governments to further federal immigration enforcement but does not require such. 8 U.S.C. §§ 1357(g), 1103(a)(11)(b). Additionally, a civil immigration detainer is explicitly a "request" to state or local law enforcement. 8 C.F.R. § 287.7(a). Likewise, administrative warrants are issued by a federal agency rather than a judge, which multiple courts have held to mean that state and local

cooperation is voluntary. *See Galarza v. Szalczyk,* 745 F.3d 634, 645 (3d Cir. 2014); *United States v. California,* 921 f.3d 865, 887 (9th Cir. 2019).

Yet Plaintiff's claims seek to effectively mandate Colorado expend state resources to implement the federal immigration scheme. First, holding that the limitations on collection and disclosure of individuals' personal information violates the Supremacy Clause would require Colorado and Denver to allow officials to spend time on the clock collecting and sharing information with the Federal Government (*see* D. 63 at 26 ("But if the federal government can require that state and local employees be permitted to spend their official time and resources sharing information with it, then the federal government wrests control of those employees' job duties from the state and local governments that employe them.")). Not only would this outcome compel Colorado and Denver to "bear the expense" of the federal civil immigration scheme by forcing them to pay officials performing functions solely for the purpose of a federal regulatory program, it would also remove authority over these officials from Colorado and Denver to the Federal Government. This is exactly the result contemplated and rejected in *Printz,* where the Supreme Court struck down a federal statute commanding state officers to conduct background checks pursuant to a federal regulatory program. 521 U.S. 898. The holding in *Printz* was clear: the Constitution does not grant Congress the authority to "dragoon" state officers into administering federal law. *Id.* at 928.

Second, holding that the prohibition on state and local officials arresting or detaining individuals pursuant to civil immigration detainers or administrative warrants violates the Supremacy Clause would require Colorado and Denver to allow use of law enforcement time, resources, and custodial facilities to arrest and hold individuals purely for federal civil immigration

purposes. Again, this would directly force Colorado and Denver to bear the cost of enforcing the federal immigration scheme and remove their authority to determine the proper allocation of state resources. The same is true for the challenged laws prohibiting governmental entities from contracting with the Federal Government to detain individuals for federal immigration purposes and imposing limitations on the allocation of state resources to privately-owned immigration detention facilities. Striking these laws down would require Colorado to permit use of state facilities and funds for federal immigration purposes. Additionally, because detainers contain an information sharing component (requesting that state officials notify DHS when an individual is eligible for release), requiring compliance would result in Congressional conscription of state and local employees for the same reasons as with the information sharing provisions discussed above.

Similarly, holding that the limitations on federal immigration official access to city and county jails for interview and immigration enforcement purposes violates the Supremacy Clause would require the city and county of Denver to allow the Federal Government access to and use of its facilities for federal immigration purposes.[3] Aside from the fact that the Constitution does not explicitly enumerate Congressional power to commandeer state and local facilities for federal purposes and that such commandeering imposes a financial burden on state and local governments, the Fifth Amendment has been interpreted to proactively forbid federal physical occupation of state and local property without just compensation. *See Yee v. City of Escondido, Cal.*, 503 U.S. 519, 527 (1992) ("The government effects a physical taking [] where it *requires* the landowner to submit to the physical occupation of his land."); *United States v. 50 Acres of Land*, 469 U.S. 24,

[3] The court in *Illinois* held that because the language of federal immigration laws permits but does not require "allow[ing] federal immigration officials access to detainees held in state facilities," there was no "hook" for the United States' preemption argument with respect to providing access to individuals in detention for state and local offenses to facilitate ICE interviews. *Illinois,* 796 F.Supp.3d at 530–531 (quoting *Arizona,* 567 U.S. at 410).

31 (1984) ("[I]t is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when it is [taken] by the United States.").

Finally, holding that the requirement that state and local officials inform detained individuals of certain rights before coordinating an interview with federal immigration officials violates the Supremacy Clause and would impermissibly shift authority over these officials from Colorado and Denver to the Federal Government. In contrast to Plaintiff's other arguments that would have the Court require Colorado and Denver to allow state and local officials to engage in certain conduct, Plaintiff's argument here would prohibit Colorado and Denver from requiring officials to engage in certain conduct. In both instances, Plaintiff seeks to usurp control over Colorado and Denver officials by dictating what the officials can and cannot do. The difference between Congress "command[ing] 'affirmative' action as opposed to imposing a prohibition" is an "empty" distinction. *Murphy,* 584 U.S. at 474 (holding that a federal statute prohibiting state authorization of sports gambling violated the Tenth Amendment because it "unequivocally dictate[d] what a state legislature may and may not do"). The Federal Government does not have the power to direct the Colorado legislature or Colorado state and local officials in such a fashion. *See New York,* 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

For these reasons, holding in favor of Plaintiff on any of its claims would result in allowing Congress to conscript Colorado and Denver resources to implement the federal immigration scheme. But Colorado and Denver have the right to refuse to expend their resources to implement

a federal regulatory program. Therefore, any holding in favor of Plaintiff would run afoul of the Tenth Amendment, and the Court need not discuss Plaintiff's preemption, discrimination, or federal regulation arguments.[4]

## V. CONCLUSION

Accordingly, the Motion to Dismiss by State of Colorado, Governor Jared Polis, and Attorney General Philip Weiser (D. 37); Defendant Colorado General Assembly's Motion to Dismiss Plaintiff's Claims Against it Pursuant to Fed.R.Civ.P. 12(b)(6) (D. 38); and City and County of Denver's Motion to Dismiss First Amended Complaint (D. 39) are GRANTED. It is FURTHER ORDERED that the Clerk of the Court shall close this case.

DATED March 31, 2026.

BY THE COURT:



Gordon P. Gallagher
United States District Judge

[4] Two other district courts, in *Illinois*, 796 F.Supp.3d 494 and *New York N.D.N.Y.*, 810 F.Supp.3d 329, faced with similar claims from Plaintiff regarding state "sanctuary laws" have extensively analyzed Plaintiff's preemption, discrimination, and direct regulation arguments. Both courts dismissed Plaintiff's claims, finding no express or implied preemption, Plaintiff failed to identify a valid comparator as needed for its discrimination claim, and no direct regulation of the federal government.

This Court his fully reviewed those very thorough opinions, issued by the Honorable Lindsay C. Jenkins (N.D. Ill.) and the Honorable Mae A. D'Agostino (N.D.N.Y). This Court is wholly in accord with those courts and adopts their analysis and reasoning. While this Court is aware that Judge Jenkins and Judge D'Agostino sit in different Circuits, that bears little relevance in this circumstance because much of the foundation of their analysis is based in the United States Constitution and interpretation thereof by the United States Supreme Court (as opposed to Circuit-specific law) and is thus *stare decisis* for all Circuits. And the state and local laws and ordinances challenged in each case are substantially similar across all three cases.

While agreeing with the analysis of both Judges Jenkins and D'Agostino, I found the Constitutional bar presented by the Tenth Amendment dispositive of all matters and determined that further discussion of that topic was warranted.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**District Judge Gordon P. Gallagher**

Civil Action No. 25-cv-01391-GPG-KAS

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF COLORADO,
JARED POLIS, Governor of Colorado, in his official capacity,
COLORADO GENERAL ASSEMBLY,
PHILIP WEISER, Attorney General of Colorado, in his official capacity,
CITY AND COUNTY OF DENVER,
DENVER CITY COUNCIL,
MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity,
DENVER SHERIFF DEPARTMENT, and
ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,

Defendants.

---

**FINAL JUDGMENT**

---

In accordance with the orders filed during the pendency of this case, and pursuant to Federal Rule of Civil Procedure 58(a), the following Final Judgment is hereby entered.

Pursuant to the [D. 72] Order entered by Judge Gordon P. Gallagher on March 16, 2026, it is

ORDERED that the Defendants State of Colorado, Governor Jared Polis, and Attorney General Philip Weiser's Motion to Dismiss [D. 37] is GRANTED. It is

FURTHER ORDERED that the Defendant Colorado General Assembly's Motion to Dismiss [D. 38] is GRANTED. It is

FURTHER ORDERED that the Defendant City and County of Denver's Motion to Dismiss [D. 39] is GRANTED. It is

FURTHER ORDERED that judgment is entered in favor of Defendants and against Plaintiff. It is

FURTHER ORDERED that this case is closed.

Dated at Denver, Colorado this 31st day of March, 2026

FOR THE COURT:

JEFFREY P. COLWELL, CLERK

By: s/D. Clement
Donald Clement,
Deputy Clerk