**Case No. 26-1214**

# United States Court of Appeals
# for the
# Tenth Circuit

UNITED STATES OF AMERICA,
*Plaintiff - Appellant,*

– v. –

STATE OF COLORADO; JARED POLIS, Governor of Colorado, in his official capacity; COLORADO GENERAL ASSEMBLY; PHILIP WEISER, Attorney General of Colorado, in his official capacity; CITY AND COUNTY OF DENVER; DENVER CITY COUNCIL; MIKE JOHNSTON, Mayor for the City and County of Denver, in his official capacity; DENVER SHERIFF DEPARTMENT; ELIAS DIGGINS, Sheriff of Denver, Colorado, in his official capacity,
*Defendants-Appellee.*

On Appeal from the United States District Court for the District of Colorado, The Honorable Gordon P. Gallagher, Case No. 1:25-cv-01391

COLORADO APPELLEES' ANSWER BRIEF

PHILIP J. WEISER
Attorney General of Colorado
DAVID MOSKOWITZ
TALIA KRAEMER
SAM WOLTER
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
*Counsel for State of Colorado, Governor Jared Polis, and Attorney General Philip J. Weiser*

MATHA M. TIERNEY
Tierney Lawrence Stiles LLC
225 E. 16th Avenue, Suite #350
Denver, CO 80203
Telephone: (303) 356-4870
*Counsel for the Colorado General Assembly*

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

STATEMENT OF RELATED CASES .......... xii

INTRODUCTION .......... 1

STATEMENT OF THE ISSUES .......... 5

STATEMENT OF THE CASE .......... 6

A. Colorado's Anticommandeering Laws .......... 6

B. Federal Immigration Law .......... 11

1. The INA allows States a choice to voluntarily participate. .......... 11

2. Congress has long required convicted noncitizens to serve their sentences. .......... 12

C. Proceedings Below .......... 14

SUMMARY OF THE ARGUMENT .......... 17

ARGUMENT .......... 19

I. The Court should affirm dismissal of the preemption claims. .......... 19

A. The Supremacy Clause does not empower Congress to regulate States directly or commandeer state resources. .......... 19

B. The Anticommandeering Laws are not obstacle preempted. .......... 23

1. There is no conflict between the Anticommandeering Laws and the INA. .......... 23

a. The United States' "cooperative federalism" theory is textually unfounded and was forfeited. ........ 23

b. The Anticommandeering Laws are not obstacle preempted by DHS's detention and removal authority. ........ 27

c. The United States' remaining arguments lack merit. ........ 31

2. The United States' arguments on obstacle preemption raise serious constitutional concerns. ........ 35

C. The Anticommandeering Laws are not expressly preempted. ........ 43

1. There is no conflict between the information-sharing provisions and sections 1373 and 1644. ........ 44

2. Sections 1373 and 1644 cannot preempt the Anticommandeering Laws. ........ 53

3. The United States' position raises constitutional concerns. ........ 55

II. The Court should affirm the dismissal of the intergovernmental immunity claims. ........ 59

A. The Anticommandeering Laws do not discriminate against the federal government. ........ 59

B. Accepting the federal government's discrimination theory would raise serious constitutional concerns. ........ 65

III. In any event, the Colorado General Assembly is not a proper defendant. ........ 66

IV. The Court should decline to adopt the federal government's proposed relief. ........ 68

CONCLUSION .................................................................................. 69

STATEMENT REGARDING ORAL ARGUMENT ................................ 71

## TABLE OF AUTHORITIES

### Cases

*Arizona v. United States*,
567 U.S. 387 (2012)........................................2, 11, 12, 20, 21, 34, 48, 60

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)..................................................................................21

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..................................................................................33

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ...............................................................34

*Blanchard v. Bergeron*,
489 U.S. 87 (1989)....................................................................................52

*Bronson v. Swensen*,
500 F.3d 1099 (10th Cir. 2007) ...............................................................66

*Brooks v. Mentor Worldwide LLC*,
985 F.3d 1272 (10th Cir. 2021) ...............................................................17

*California v. Zook*,
336 U.S. 725 (1949)..................................................................................26

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .................................................................47

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)...........................................................................20, 52

*City & County of San Francisco v. Garland*,
42 F.4th 1078 (9th Cir. 2022)...................................................................54

*City & County of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) .....................................................58

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ....................................................................7

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) ..........................................54, 56, 58

*City of Colorado Springs v. Solis*,
589 F.3d 1121 (10th Cir. 2009) ...............................................................59

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ...................................................................34

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999).......................................................................56

*City of Philadelphia v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018)..................................................47, 54

*Coloradans for a Better Future v. Campaign Integrity Watchdog*,
409 P.3d 350 (Colo. 2018).........................................................................46

*Colorado v. U.S. Dep't of Just.,*
455 F. Supp. 3d 1034 (D. Colo. 2020).......................................................38

*County of Ocean v. Grewal,*
475 F. Supp. 3d 355 (D.N.J. 2020) ....................................................37, 47

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)...................................................................................42

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990).....................................................................................25

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014)................................................................29, 37

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022)......................................................................21

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)....................52

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981)....................40

*Kansas v. Garcia*,
589 U.S. 191 (2020)....................21

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018)....................48

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)....................48

*Mac Manus v. Love*,
179 Colo. 218 (1972)....................66

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022)....................30, 34, 60, 61

*Murphy v. NCAA*,
584 U.S. 453 (2018)....................4, 19, 20, 22, 23, 36, 37, 41, 42, 43,
53, 54, 55, 56, 57, 58, 65, 67

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)....................49

*New York v. U.S. Dep't of Just.*,
951 F.3d 84 (2d Cir. 2020)....................56

*New York v. United States*,
505 U.S. 144 (1992)....................22, 35, 39

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen.*,
8 F.4th 176 (3d Cir. 2021)....................53

*Oregon v. Ice*,
555 U.S. 160 (2009)....................39

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019)....................................................54, 58

*P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
485 U.S. 495 (1988)..........................................................................25

*Printz v. United States*,
521 U.S. 898 (1997)..........................................................22, 36, 57, 58

*Puerto Rico v. Sanchez Valle*,
579 U.S. 59 (2016)............................................................................39

*Reno v. Condon*,
528 U.S. 141 (2000).....................................................................36, 57

*Ridenour v. Kaiser-Hill Co.*,
397 F.3d 925 (10th Cir. 2005) ...............................................................35

*Riegle v. Fed. Open Mkt. Comm.*,
656 F.2d 873 (D.C. Cir. 1981)...............................................................67

*S. Furniture Leasing, Inc. v. YRC, Inc.*,
989 F.3d 1141 (10th Cir. 2021) .............................................................34

*Seeley v. Chase*,
443 F.3d 1290 (10th Cir. 2006) .............................................................69

*Stanley v. City of Sanford*,
606 U.S. 46 (2025)............................................................................30

*Steinle v. City & County of San Francisco*,
919 F.3d 1154 (2019) ..................................................................50, 51

*United States v. California*,
314 F. Supp. 3d 1077 (E.D. Cal. 2018)..............................................56, 62

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .........................28, 29, 30, 38, 41, 45, 47, 49,
50, 51, 57, 60, 61, 63, 65, 66

*United States v. City of New York*,
1:24-cv-04084, 2026 WL 3083753 (E.D.N.Y. Oct. 15, 2026) .................. 56

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........ 15, 29, 32, 37, 47, 51, 60, 61, 68

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .................................................. 36, 37, 60

*United States v. Leffler*,
942 F.3d 1192 (10th Cir. 2019) ............................................................ 26

*United States v. Locke*,
529 U.S. 89 (2000) .................................................................................. 41

*United States v. New Jersey*,
No. 20-cv-01364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ............... 61, 66

*United States v. New Jersey*,
No. 3:26-cv-01770, 2026 WL 2621025 (D.N.J., Sep. 4, 2026) ..... 37, 62, 66

*United States v. New York*,
810 F. Supp. 3d 329 (N.D.N.Y. 2025) .............................. 15, 32, 61, 66, 68

*United States v. New York*,
814 F. Supp. 3d 266 (N.D.N.Y. 2025) ............................................... 37, 60

*United States v. Washington*,
596 U.S. 832 (2022) ................................................................................ 59

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ................................................................................ 20

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025) ........................................................... 33

*Washington v. United States*,
460 U.S. 536 (1983) ................................................................................ 59

*Wyeth v. Levine*,
555 U.S. 555 (2009) ... 21

*Yates v. United States*,
574 U.S. 528 (2015) ... 46

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ... 35

**Statutes**

5 Ill. Comp. Stat. 805/15 ... 10

8 U.S.C. § 1226 ... 28, 55

8 U.S.C. § 1227 ... 25, 39

8 U.S.C. § 1231 ... 24, 28, 39, 55

8 U.S.C. § 1326 ... 14

8 U.S.C. § 1357 ... 2, 12

8 U.S.C. § 1360 ... 50

8 U.S.C. § 1367 ... 50

8 U.S.C. § 1373 ... 5, 12, 43, 44, 46, 48, 53

8 U.S.C. § 1644 ... 5, 12, 43, 44, 46, 48, 53

C.R.S. § 24-72-204 ... 9, 44, 45, 62, 63

C.R.S. § 24-74.1-102 ... 3, 10, 27, 30, 31, 63, 64

C.R.S. § 24-74-101 ... 7, 8

C.R.S. § 24-74-103 ... 6, 7, 9, 27, 28, 44, 45, 55

C.R.S. § 24-74-104 ... 6, 10, 27, 31

C.R.S. § 24-74-105 .......... 9, 27, 28

C.R.S. § 24-76.6-101 .......... 46

C.R.S. § 24-76.6-102 .......... 3, 8, 29

C.R.S. § 24-76.6-103 .......... 3, 9, 10, 11, 28, 45, 46, 63, 64

C.R.S. § 24-76.7-102 .......... 6

C.R.S. § 24-76.7-103 .......... 3, 6, 8

**Other Authorities**

16 Fed. Prac. & Proc. Juris. § 3937.1, Retained Jurisdiction (3d ed. updated 2026) .......... 69

Act of Feb. 5, 1917,
Pub. L. No. 64-301, 39 Stat. 874 .......... 13

Act of Mar. 4,
1929, Pub. L. No. 70-1018, 45 Stat. 1551 .......... 13

Antiterrorism and Effective Death Penalty Act of 1996,
Pub. L. No. 104-132, 110 Stat. 1214 .......... 14

Cleo Westin, *El Paso County Transfers 26 People to ICE Custody Over 3 Months, Sets New Monthly High*, Colo. Springs Gazette (Oct. 16, 2025), https://gazette.com/2025/10/16/el-paso-county-transfers-26-people-to-ice-custody-over-3-months-sets-new-monthly-high/ .......... 9

Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear of Deportation*, N.Y. Times (June 3, 2018), https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html .......... 8

H.B. 19-1124, 72nd Gen. Assemb., 2019 Reg. Sess. (Colo. 2019) .......... 6, 7

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) .......... 51, 52

Immigration and Nationality Act,
Pub. L. No. 82-414, 66 Stat. 163 (1952) .... 13

**Regulations**

8 C.F.R. § 287.7 .... 29

**Constitutional Provisions**

Colo. Const. art. III .... 66

Colo. Const. art. V .... 66

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## INTRODUCTION

The General Assembly has lawfully directed Colorado's limited law enforcement resources towards enforcing criminal laws and protecting Coloradans, not the federal government's immigration duties. The District Court rightfully dismissed the United States' Supremacy Clause challenges to those laws (collectively, the "Anticommandeering Laws"). The Constitution protects Colorado's sovereign right to decline to use its resources to assist with the federal government's immigration enforcement program and prevents the United States from commandeering those resources.

This lawsuit was initially premised on a false story—that a foreign terrorist organization "seiz[ed] control" of part of Aurora as a "direct byproduct" of "sanctuary policies." Appx13. Now, the United States drops that unsupported theory and shifts to a new, unsupported, and unpreserved legal theory. According to the United States, when Congress required noncitizens convicted of crimes to serve their sentences before being deported, Congress imposed a "choice" on States: assist with federal immigration enforcement or do not "subject aliens to their criminal-justice systems at all." Op. Br. 1, 28–29. There is no

evidence to support this theory, let alone that it was "the clear and manifest purpose of Congress," as necessary to preempt historic state police powers. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation modified). In reality, for over a century—long before States were allowed to play even a voluntary role in immigration enforcement—Congress has prohibited deporting convicted noncitizens until they complete their sentences, without imposing any "choice" on States.

Congress did offer States a different choice through the Immigration and Nationality Act ("INA"), allowing States to *voluntarily* participate in immigration enforcement. For example, Congress provided that States "may" enter into agreements to allow use of state and local resources for immigration enforcement. 8 U.S.C. § 1357(g). But the United States now attempts to use obstacle preemption to transform that voluntary choice into one where States cannot decline to assist with immigration enforcement.

The United States equally distorts Colorado law. For example, contrary to its unsupported assertions, no Colorado law limits prisoner transfers, nor prohibits providing release dates, which are public

information. Instead, Colorado law prohibits detaining prisoners beyond the length of their sentences or using Colorado's limited detention space for immigration purposes. C.R.S. §§ 24-76.6-102, 24-76.7-103. The United States' true gripe is that it wants to commandeer those resources, but Colorado declined. Likewise, no Colorado law mandates "tipping-off" anyone. Though not required, Colorado agreed to facilitate interviews between immigration authorities and state or local prisoners, so long as the state and local facilitators provide those individuals with notice of basic rights, such as the right to consult an attorney. *Id.* 24-76.6-103(2). These are overt interviews with incarcerated individuals, not undercover operations. And the other challenged law merely directs certain public entities to adopt policies to communicate with the subjects of information or access requests "as appropriate"; it does not dictate those policies' content, nor require notifications in any circumstances. *Id.* § 24-74.1-102(3)(a)(VII).

Once the many distortions are removed, the claims fall apart. Colorado's laws are not preempted because they do not conflict with federal law, nor do they unlawfully discriminate against the federal government. To the extent there is any conflict, the Constitution

prohibits commandeering Colorado's resources to enforce or administer federal immigration laws or "dictat[ing] what a state legislature may and may not do." *Murphy v. NCAA*, 584 U.S. 453, 474 (2018). Yet here, removing any doubt, the United States has taken the extraordinary step of directly suing the Colorado General Assembly based on its "past and continued" passage of legislation. Appx173. The Court should affirm the dismissal of all claims.

## STATEMENT OF THE ISSUES

1. Whether the Anticommandeering Laws are obstacle preempted by the INA?

2. Whether the information-sharing provisions of those laws are expressly preempted by 8 U.S.C. §§ 1373(a), 1644?

3. Whether those laws unlawfully discriminate against the federal government, in violation of intergovernmental immunity?

4. Whether the Colorado General Assembly may be sued for its past and continued passing of legislation?

## STATEMENT OF THE CASE

### A. Colorado's Anticommandeering Laws

Pursuant to its sovereign authority, the Colorado General Assembly has enacted interrelated statutes governing the use of Colorado's state and local government resources in relation to civil immigration enforcement (collectively the "Anticommandeering Laws"). The United States challenged four enacted Colorado laws it collectively refers to as "the Sanctuary Policies," Op. Br. 8 n.2: H.B. 19-1124, S.B. 21-131, H.B. 23-1100, and S.B. 25-276.

As the Assembly explained, these laws were designed to "promote public safety" by ensuring that Colorado's resources be directed to enforcing criminal laws and protecting Coloradans, not to performing the federal government's immigration enforcement duties. *See, e.g.*, H.B. 19-1124, 72nd Gen. Assemb., 2019 Reg. Sess. (Colo. 2019) §§ 1(a)–(b), 2 (declaring the "federal government does not have the authority to command state or local officials to enforce or administer a federal regulatory program" or to "perform the duties of the federal government"). For that reason, all the Anticommandeering Laws direct state and local agencies, officials, and resources. *See, e.g.*, C.R.S. §§ 24-74-103 to 104; *id.* § 24-76.7-102 to 103. None direct federal agencies or

officials. Nor are they intended to obstruct federal officials; indeed, numerous statutes contain express carveouts for compliance with federal law. *See, e.g.*, *id.* § 24-74-103.

In addition to optimizing use of limited state resources, the laws were motivated by the concern that using Colorado's public safety agencies to "play a role in enforcing federal civil immigration laws can undermine public trust." H.B. 19-1124 § 1(c). Such a loss of public trust can harm public safety and welfare by "deter[ring] persons from accessing . . . services offered by state agencies," C.R.S. § 24-74-101(1)(e); preventing "crime victims . . . who seek justice and due process of law" from engaging with law enforcement or the courts, H.B. 19-1124, § 1(f); or deterring individuals from complying with probation requirements. *See also City of Chicago v. Barr*, 961 F.3d 882, 886–87 (7th Cir. 2020) (many governments have "determined that . . . effective law enforcement requires the cooperation of [their] undocumented residents"); Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear of Deportation*, N.Y. Times (June 3,

2018).[1] The General Assembly emphasized that the laws are "not intended to interfere with criminal investigations," C.R.S. § 24-74-101(1)(h), that they do not preclude enforcement of any criminal law, and that they protect law enforcement's ability to "participat[e] in coordinated law enforcement actions with federal law enforcement agencies" to enforce all criminal laws. *Id.* §§ 24-76.6-102(5).

Accordingly, the Anticommandeering Laws focus state resources on issues deemed critical by the General Assembly, such as criminal law enforcement, instead of assisting in enforcing civil immigration law. They do so in several ways.

*First*, the Anticommandeering Laws limit the use of Colorado resources for immigration detention. Colorado governmental entities are prohibited from "enter[ing] into or renew[ing] an immigration detention agreement." C.R.S. § 24-76.7-103(1). Additionally, Colorado law enforcement officers are prohibited from "arrest[ing] or detain[ing] an individual on the basis of a civil immigration detainer." *Id.* § 24-76.6-102(2)(a). These laws ensure that Colorado's limited detention capacity

---

[1] https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html.

is dedicated to criminal detention, not immigration detention. These laws do not limit transfer of custody, nor restrict providing prison release dates, which are public information. *See also, e.g.*, Cleo Westin, *El Paso County transfers 26 people to ICE custody over 3 months, sets new monthly high*, Colorado Springs Gazette (Oct. 16, 2025).[2]

*Second*, the laws limit the disclosure of certain confidential personal information. State and local subdivision employees are prohibited from disclosing certain nonpublic, personal identifying information for the purpose of assisting in immigration enforcement, "except as required by federal or state law." C.R.S. § 24-74-103(1); *see also id.* § 24-72-204(7)(b)(I) (parallel prohibition for driver's license and vehicle registration information). Colorado probation and pretrial services employees are similarly prohibited from sharing a narrower set of confidential personal information. *Id.* § 24-76.6-103(1). Colorado likewise restricts the allowed usages of confidential personal information collected in its proprietary databases, requiring third parties granted access to sign a certification. *Id.* § 24-74-105(1)(a).

[2] https://gazette.com/2025/10/16/el-paso-county-transfers-26-people-to-ice-custody-over-3-months-sets-new-monthly-high/.

*Third*, the laws limit the unnecessary collection of personal information by state agencies and local subdivisions. State and local subdivision employees are prohibited from requesting certain personal information unless required by state or federal law, necessary to perform official duties, or to verify eligibility for certain federal benefits. *Id.* § 24-74-104.

*Fourth*, the United States identifies two provisions that it inaccurately calls "tipoff provisions." The first requires certain public entities—including public schools and public libraries—to establish various policies. Among them are procedures to communicate, "as appropriate," about immigration authority requests for information or access to individuals. *Id.* § 24-74.1-102(3)(a)(VII). The laws do not dictate the content of the policies, nor require notifications in any circumstances, just that these public entities must adopt a policy. *Id.* The second allows law enforcement officers to coordinate interviews between immigration authorities and incarcerated individuals. *Id.* § 24-76.6-103(2). No law requires facilitating these interviews, and some States refuse. *E.g.*, 5 Ill. Comp. Stat. 805/15(h). Colorado agreed to allow facilitation but requires its own facilitators to provide

incarcerated individuals with basic information about their rights, such as the right to speak to an attorney. *Id.* § 24-76.6-103(2).

The Anticommandeering Laws contain numerous other provisions. While the United States purports to challenge every word of the four bills and seeks to enjoin them in full, it does not address many of the provisions on appeal and waives any challenge to those provisions.

## B. Federal Immigration Law

Congress enacted the INA to regulate the presence of noncitizens in the United States, specify which noncitizens may be removed, and establish procedures for doing so. *Arizona*, 567 U.S. at 394–96. Under the INA, the Department of Homeland Security ("DHS") is responsible for identifying, apprehending, and removing individuals in the country unlawfully. *Id.* at 397.

### 1. The INA allows States a choice to voluntarily participate.

States may, but are not required to, participate to a limited extent in INA enforcement. For example, "to the extent consistent with State and local law," state and local law enforcement officers can assume the duties of federal immigration agents subject to federal direction and supervision, if the State or locality enters into a formal written

agreement (referred to as "287(g) agreements") with the federal government. 8 U.S.C. § 1357(g)(1)–(4). Assistance under such an agreement can include "participat[ing] in a joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410. However, the INA expressly states that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9).

With one exception, the INA does not purport to directly regulate state conduct. Specifically, 8 U.S.C. § 1373(a) provides that States "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id*; *see also id.* § 1644 (similar).

### 2. Congress has long required convicted noncitizens to serve their sentences.

On appeal, the United States focuses heavily on the statutory requirement that noncitizens serve their criminal sentences before deportation, whether they have been convicted under federal or state

criminal laws. That provision reflects longstanding congressional policy and not any choice presented to the States. For over a century—long before States were allowed to play any role (even on a voluntary basis) in immigration—Congress has prohibited deporting noncitizens convicted of crimes until they complete their incarceration. In 1917, Congress first provided that a convicted noncitizen shall not "be deported until after the termination of his imprisonment." Act of Feb. 5, 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 890. That requirement was reenacted in 1929. Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 3, 45 Stat. 1551, 1552 ("An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment."). When the INA was originally passed in 1952—when States still played no role—Congress again reiterated its commitment that convicted noncitizens complete their terms of incarceration before deportation. Immigration and Nationality Act, Pub. L. No. 82-414, § 242(h), 66 Stat. 163, 212 (1952) ("An alien sentenced to imprisonment shall not be deported until such imprisonment has been terminated by the release of the alien from confinement.").

This consistent policy remains today, with a narrow exception allowing early deportation of certain nonviolent offenders. Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 438, 110 Stat. 1214, 1275 (1996) (originally codified at 8 U.S.C. § 1252(h) and later transferred as amended to 8 U.S.C. § 1231(a)(4)). And when Congress passed this narrow exception, it required that those deported early be notified of enhanced penalties for reentry, including completing any remaining term of incarceration without reduction for parole or supervised release. 110 Stat. at 1276; *see also* 8 U.S.C. § 1326(c). This history reflects Congress's longstanding determination that noncitizens, like U.S. citizens, should serve their criminal sentences—whether in federal, state, or local custody—and not just be deported without punishment.

### C. Proceedings Below

In May 2025, the United States filed this action against Colorado, its Governor, its Attorney General, the Colorado General Assembly, the City and County of Denver, and multiple Denver municipal defendants. Appx12. The United States alleged that Colorado's Anticommandeering Laws, along with various municipal ordinances and policies, were

expressly and impliedly preempted (Claim 1) and directly regulated and discriminated against the federal government in violation of intergovernmental immunity principles (Claims 2 and 3). Appx37–38. All defendants moved to dismiss. Appx40, 69, 82.

This action was part of more than a dozen lawsuits the United States filed, all raising the same three claims against various States and localities. Because *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), was the first-decided case, it featured prominently in the proceedings below, cited by the parties more than 40 times. The second decision, *United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025), issued shortly after briefing completed.

The District Court dismissed the Complaint under Rule 12(b)(6) in March 2026. Appx225. The Court explained its overall approach in a footnote at the end of the opinion. Appx237 n.4. It explained that the courts in the *Illinois* and *New York* cases faced substantially similar claims and had "extensively analyzed" the United States' arguments, finding "no express or implied preemption, Plaintiff failed to identify a valid comparator as needed for its discrimination claim, and no direct regulation of the federal government." *Id.* After "fully review[ing] those

very thorough opinions," the Court was "wholly in accord" with those decisions and "adopt[ed] their analysis and reasoning" as its own. *Id.* In other words, the Court adopted the analysis and reasoning to conclude that the Anticommandeering Laws were not expressly or impliedly preempted and did not discriminate against or directly regulate the federal government. Finally, the court explained that it had "determined that further discussion of [the Tenth Amendment] was warranted." *Id.*

The court began this Tenth Amendment analysis by noting that the Supremacy Clause "does not go so far as to compel state assistance" and that the "decision to implement the federal immigration scheme is reserved to the states" pursuant to the Tenth Amendment. Appx230. Because the United States' claims rested on "an interpretation of Congress's authority to regulate immigration that would compel state assistance," the court found that it failed to state claims upon which relief could be granted. Appx230. The court then analyzed how each of the United States' claims "effectively mandate Colorado expend state resources to implement the federal immigration scheme" in violation of the Tenth Amendment. Appx234–37.

## STANDARD OF REVIEW

This Court reviews de novo whether a district court properly granted a motion to dismiss for failure to state a claim. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1278 (10th Cir. 2021). The Court accepts a plaintiff's "well-pleaded facts as true" but "conclusory allegations are 'not entitled to the assumption of truth.'" *Id.* at 1281.

## SUMMARY OF THE ARGUMENT

State laws enjoy a strong presumption against federal preemption, especially laws implicating historic state police powers. That presumption is not overcome unless Congress makes unmistakably clear its intention to preempt. Nor are state laws preempted simply because they may be in tension with federal law or not aligned with federal enforcement priorities. Here, the United States cannot clear these hurdles, and the District Court's dismissal should be affirmed.

First, the Anticommandeering Laws are not impliedly preempted. Colorado's laws limit the extent to which Colorado resources may be used to assist in enforcing federal civil immigration laws, consistent with the INA's voluntary participation framework. This sovereign choice does not obstruct the federal government's ability to enforce the

INA. The United States' contrary arguments rest on its view that the INA reflects vague expectations, unsupported by the statutory text, that States would assist federal officials in carrying out their duties. And the United States cannot show a clear and manifest congressional purpose to preempt historic police powers. Further, accepting the United States' interpretation would mean compelling Colorado to implement a federal regulatory program in violation of anticommandeering principles.

Second, the Anticommandeering Laws' information-sharing provisions are not expressly preempted. The United States' contrary argument rests on nonexistent conflict between federal and state law and an overly broad reading of federal law that has been repeatedly rejected by courts. The express preemption claim is further flawed—as courts have repeatedly held—because it relies on federal statutes that are not valid preemption provisions that purport to directly regulate state conduct in contravention of anticommandeering principles.

Finally, the Anticommandeering Laws do not discriminate against the federal government. These laws do not subject the federal government to worse treatment than any similarly situated entity. Additionally, accepting the United States' argument that Colorado's

sovereign choice not to use state resources to implement a federal program constitutes unlawful discrimination would render hollow the protections of the anticommandeering principle.

## ARGUMENT

### I. The Court should affirm dismissal of the preemption claims.

The District Court rightly rejected the United States' preemption claims. Those claims rely on misreadings of the INA and the Anticommandeering Laws to manufacture conflicts that do not exist. As the District Court recognized, accepting the United States' preemption arguments would also permit it unconstitutionally to commandeer Colorado's resources and public employees, in violation of the Tenth Amendment. The dismissal order should be affirmed.

#### A. The Supremacy Clause does not empower Congress to regulate States directly or commandeer state resources.

Preemption occurs when Congress and a State enact conflicting laws that impose restrictions or confer rights on private actors. *Murphy*, 584 U.S. at 477. In such circumstances, the Supremacy Clause dictates that "federal law prevails and state law is preempted." *Id.* at 471. State laws may be impliedly or expressly preempted. As relevant here,

express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399. By contrast, obstacle preemption—a form of implied preemption—occurs "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.*[3]

A party alleging obstacle preemption faces a "high threshold." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011). Obstacle preemption does not invite courts to engage in "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Id.* "Invoking some brooding federal interest" does not suffice to strike down a state law as obstacle preempted; instead, "a litigant must point specifically to a constitutional text or a federal statute that does the displacing" of state law. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality) (citation modified). And a mere "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption," as "[t]he Supremacy

---

[3] The United States also argued below that the Anticommandeering Laws were field preempted. Appx146–48. But it has abandoned that claim on appeal.

Clause gives priority to 'the Laws of the United States,' not the . . . priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020).

Atop this already high threshold for establishing obstacle preemption, a presumption against preemption applies if the challenged state laws implicate historic state police powers. Those powers are not preempted "unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (citation modified). And "[t]he presumption applies when a state regulates in an area of historic state power even if the law touches on an area of significant federal presence." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (citation modified); *see also Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) ("The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.").

Critically, the Supremacy Clause only supplies a "rule of decision," allowing federal law regulating private actors to take precedence over conflicting state laws that do so. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). It does not empower Congress to regulate the States directly, nor does any other constitutional provision. *See*

*Murphy*, 584 U.S. at 471 ("[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States."). Because "the Constitution 'confers upon Congress the power to regulate individuals, not States,'" a federal law cannot preempt state law unless it is "best read as one that regulates private actors." *Id.* at 477 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)).

This limitation on the permissible scope of preemption reflects an "anticommandeering principle," which is inherent in the Constitution's structure and confirmed by the Tenth Amendment. *Murphy*, 584 U.S. at 471–72. The anticommandeering rule prevents Congress from issuing direct orders to the States, including to individual officers of the State or its political subdivisions. *Id.* at 472–73. Congress lacks the power to "dictate[] what a state legislature may and may not do." *Id.* at 474. Nor may the federal government "compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). This serves important functions, including preserving "a healthy balance of power between the States and the Federal Government," promoting political accountability

by maintaining clarity on whether federal or state government is responsible for regulation, and preventing the federal government from shifting to the States the costs of its regulatory programs. *Murphy*, 584 U.S. at 473–74 (citation modified).

### B. The Anticommandeering Laws are not obstacle preempted.

Because there is no conflict between federal law and the Anticommandeering Laws, there is no obstacle preemption. Further, accepting the federal government's position would raise serious constitutional doubts, creating an independent basis to reject the claim.

#### 1. There is no conflict between the Anticommandeering Laws and the INA.

##### a. The United States' "cooperative federalism" theory is textually unfounded and was forfeited.

At the outset, the United States' obstacle preemption argument fails because it rests on an imagined federal statutory scheme and was never raised below.

Under the United States' theory, the INA gives States a "choice": States must agree to facilitate a convicted noncitizen's "seamless transfer of custody" to federal immigration authorities or "not subject aliens to their criminal-justice systems at all." Op. Br. 1, 18–21. But the

INA does no such thing. Instead, Congress mandated that noncitizens who are convicted of crimes—whether under federal, state, or local law—must first serve out their terms of imprisonment before they are removed from the United States. *See* 8 U.S.C. § 1231(a)(4)(A). Congress made that choice over a century ago, and it has reaffirmed it repeatedly. *See supra* at 13–14. This is not a matter of state prerogative: the INA *forbids* DHS from removing noncitizens before they are released from incarceration, with a narrow exception for non-violent offenses under limited circumstances. 8 U.S.C. § 1231(a)(4)(A). Once these individuals are released, the INA imposes obligations on DHS related to their detention and removal, but it does not require States to participate in post-incarceration detention or removal efforts. Nor does it condition subjecting noncitizens to criminal justice on a state's agreement to later cooperate with immigration enforcement. Since the United States' theorized "cooperative federalism" scheme does not exist, Op. Br. 17, the Anticommandeering Laws pose no obstacle to the accomplishment of any Congressional purpose.

Indeed, accepting the United States' argument would attribute to Congress a policy choice directly contrary to the one actually expressed

in the INA. Whereas Congress has long enacted statutes reflecting a policy of requiring noncitizens to serve criminal sentences before deportation, and has relied heavily on state criminal convictions as a basis for deportability, *see, e.g.*, 8 U.S.C. § 1227(a)(2), under the United States' reading, the INA instead would require States who preferred not to assist with immigration enforcement to avoid subjecting noncitizens to their criminal-justice systems altogether.

The United States' effort to manufacture preemption by reading in an unstated congressional purpose underscores the Supreme Court's warning that courts should not "seek[] out conflicts between state and federal regulation where none clearly exist." *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (citation omitted). Instead, ascertaining congressional intent for the purposes of preemption analysis requires "giving [] meaning to an enacted statutory text," *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988), and the text of the INA evinces no intent to present States with the choice described by the United States. This invitation to invalidate Colorado's laws as obstacle preempted based on textually unfounded theories about Congress's statutory goals risks "setting aside great numbers of state

statutes to satisfy a congressional purpose which would be only the product of [a] [c]ourt's imagination" and should be rejected. *California v. Zook*, 336 U.S. 725, 732–33 (1949).

This Court should also decline to entertain the United States' "cooperative federalism" argument because it was never raised below. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise."). Before the District Court, the United States argued that the Anticommandeering Laws obstruct DHS's "ability to inspect, detain, and remove illegal aliens as required by the INA," Appx148, but it never argued that the INA conditions States' power to subject noncitizens to their criminal-justice systems on their assistance with federal immigration enforcement.

Finally, even were the United States' cooperative federalism theory not invented from whole cloth, it would be irrelevant to wide swaths of its obstacle preemption claims. Many of the challenged laws are not specific to convicted noncitizens. For example, the information-

sharing provisions in C.R.S. § 24-74-103 restrict disclosure of nonpublic personal identifying information regardless of conviction status. The same is true of numerous other provisions. *See, e.g.*, *id.* § 24-74-104 (limiting information collection); *id.* § 24-74-105 (concerning access to state databases); *id.* §§ 24-74.1-102 (limiting information collection and requiring adopting various policies). As a result, any purported bargain between the federal government and the States could not plausibly preempt those provisions.

#### b. The Anticommandeering Laws are not obstacle preempted by DHS's detention and removal authority.

Turning to the INA's actual text, there is no obstacle preemption. The United States identifies three sets of provisions within the Anticommandeering Laws that it argues "hinder[] federal immigration officers' ability to obtain custody" of noncitizens who are subject to detention and/or removal, thereby "undermin[ing] Congress's expectation of seamless transfer of custody." Op. Br. 20–21. Its sole bases are INA provisions requiring DHS to detain certain noncitizens and to conduct removal within certain timeframes. *See* 8 U.S.C.

§§ 1226(c)(3) and § 1231(a)(1)(A)–(B). These provisions do not preempt the Anticommandeering Laws.

***Limitations on information-sharing.*** The United States first suggests that Colorado's choice to restrict its employees from sharing certain information for immigration enforcement purposes unlawfully poses an obstacle to DHS's detention and removal duties. Op. Br. 20–21 (citing C.R.S. §§ 24-74-103(1), 24-74-105(1), 24-76.6-103(1)(a)). However, the portions of the INA concerning detention and removal on which the United States relies impose obligations on federal officials, not state ones, and they do not mandate information-sharing. Colorado's decision not to provide federal authorities with information that it is not required to, such as an "alien's home address," Op. Br. 20, does not pose an obstacle to the "the federal government's ability to discharge its operations." *United States v. California*, 921 F.3d 865, 885 (9th Cir. 2019). Colorado's sovereign choice may mean federal agencies must pursue their own investigations to locate individuals who are subject to detention and removal, instead of relying on state employees' collection and disclosure of information. But "refusing to help is not the

same as impeding." *Id.* at 888 (citation omitted); *Illinois*, 796 F. Supp. 3d at 529.

***Immigration detainers.*** The United States also challenges Colorado's decision not to detain individuals based on a civil immigration detainer request, claiming this poses an obstacle to DHS taking custody of certain noncitizens. Op. Br. 20–21 (citing C.R.S. § 24-76.6-102(2)(a), (4)). However, federal law makes clear that a state's choice of whether to detain a person pursuant to a civil immigration detainer request is entirely voluntary. *Galarza v. Szalczyk*, 745 F.3d 634, 640–41 (3d Cir. 2014) (explaining that the INA "does not authorize federal officials to command state or local officials to detain suspected aliens subject to removal" and collecting cases holding that detainers are "requests"); 8 C.F.R. § 287.7(a) ("The detainer is a request . . . ."). Declining to voluntarily detain individuals on behalf of the federal government does not pose an obstacle to a federal law that itself leaves that choice to the States. *California*, 921 F.3d at 885.

Unable to identify any actual conflict with the federal scheme, the United States contends that Congress "expect[ed]" or "contemplat[ed]" the "seamless transfer" of custody and provision of information between

States and federal immigration authorities, therefore implicitly requiring States to honor detainer requests or disclose individuals' personal information. Op. Br. 20–21; *see also id.* at 15, 34. But "as [the Supreme Court] has 'emphasized many times,' what Congress (possibly) expected matters much less than what it (certainly) enacted." *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (citation omitted). Other courts have repeatedly rejected this reasoning. *See McHenry County v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (even if Congress had "hoped or expected that states would cooperate" with detainer requests, states "are not bound by that hope or expectation"); *California*, 921 F.3d at 891 (explaining that "we must distinguish between expectations and requirements" in rejecting analogous preemption claim).

***Notification provisions.*** Third, the United States turns to provisions requiring certain public entities to adopt procedures for communicating, "as appropriate," when federal immigration authorities request information about individuals or their children, which the United States inaccurately describes as "tip-off" provisions. Op. Br. 21–22; *see* C.R.S. § 24-74.1-102(3). The United States offers no argument as to *how* this modest requirement actually poses an obstacle

to federal enforcement beyond hyperbolically comparing it to state authorities helping an individual to evade a criminal investigation by the FBI. Op. Br. 21–22. Moreover, the relevant provision—which the United States seeks to invalidate facially—does not even dictate the content of those policies, let alone require notifications in any particular circumstances. C.R.S. § 24-74.1-102(3)(a)(VII).

***Remaining provisions of the Anticommandeering Laws.*** Though the United States purports to seek facial injunctive relief against every provision of four enacted laws, it makes no argument on appeal that the vast majority of those provisions are obstacle preempted. *See* Appx13–14 (seeking injunction preventing Colorado from enforcing H.B. 19-1124, S.B. 21-131, H.B. 23-1100, and S.B. 25-276). The United States has forfeited any argument that those other provisions of Colorado law, such as laws limiting data collection, C.R.S. §§ 24-74-104, 24-74.1-102, are obstacle preempted.

#### c. The United States' remaining arguments lack merit.

The United States' attacks on the District Court's analysis are similarly meritless. It argues that the District Court did not properly analyze its obstacle preemption claims because it failed to identify the

congressional purpose underlying the INA provisions governing detention and removal of noncitizens subject to state criminal prosecution. Op. Br. 22. If by this, the United States means that the District Court erred by not identifying the nonexistent "cooperative federalism" scheme that the United States itself never identified in the proceedings below, that was no error. To the extent the United States instead suggests that the District Court failed to grapple with the purposes and objectives of the relevant INA provisions at all, that is untrue. The District Court "adopt[ed] the[] analysis and reasoning" of two "thorough opinions" issued by courts in other districts addressing substantially similar claims by the United States, each of which extensively considered the purposes and objectives of the implicated INA provisions in rejecting the United States' arguments that they evince a congressional purpose to force States to assist in detention and removal efforts. *Illinois*, 796 F. Supp. 3d at 525–31 (explaining that "[t]o understand the purpose of the INA, the court considers the entire scheme" which demonstrates Congress's intent "that States have the option to assist in civil immigration enforcement") (citation modified); *see also New York*, 810 F. Supp. 3d at 340–41, 348–51. As Colorado

argued below, that reasoning applied equally to Colorado's challenged laws, even if Colorado's laws are not identical in every respect.

Next, the United States alleges that the District Court failed to analyze whether the Anticommandeering Laws "functionally frustrate" the federal scheme. Op. Br. 22–23. But the cited case merely used that phrase to describe ordinary obstacle-preemption analysis, not some separate analysis. *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1082 (10th Cir. 2025). Nor did the United States argue otherwise below, so any argument requiring a separate analysis is forfeited.

Finally, the United States claims the District Court erred by failing to resolve disputes about the scope of the Anticommandeering Laws that "could bear heavily" on the preemption analysis. Op. Br. 23. But it gives only one example—its unsupported assertion that the Anticommandeering Laws preclude releasing noncitizens into federal custody upon completing their state incarceration. Op. Br. 23. As below, it does not identify any Colorado law it claims precludes this, because none do. *Id.* Nor did the District Court err in declining to treat this unsupported legal conclusion as a factual allegation. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Indeed, this is a facial challenge: "the facial

validity of a statute is decided by reference to all of the conduct that is proscribed by the statute." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *see also S. Furniture Leasing, Inc. v. YRC, Inc.*, 989 F.3d 1141, 1147 n.2 (10th Cir. 2021) (statutory interpretation is "a strictly legal question").

In sum, the INA provides States and localities with various means by which they can voluntarily assist the federal government in enforcing civil immigration laws, but it leaves to States the choice to provide such assistance. *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Federal law does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement."); *see also McHenry Cnty.*, 44 F.4th at 592 (federal immigration law reflecting mere hope of state cooperation does not preempt state law withholding such cooperation). The United States falls far short of showing it was Congress's "clear and manifest purpose" to displace state law. *See Arizona*, 567 U.S. at 400 (citation modified). The Court should reject the United States' attempts to use obstacle preemption to transform a voluntary assistance scheme into one that States cannot decline.

### 2. The United States' arguments on obstacle preemption raise serious constitutional concerns.

Adopting the United States' position fails for the additional reason that it would raise serious constitutional concerns by allowing the federal government to force States to assist with federal immigration enforcement. The Court should reject this reading to avoid the unconstitutional commandeering issues it presents. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (describing the "cardinal principal of statutory interpretation" of avoiding, where possible, statutory construction that would "raise[] a serious doubt as to its constitutionality" (citation modified)); *see also Ridenour v. Kaiser-Hill Co.,* 397 F.3d 925, 934 (10th Cir. 2005) (same).

The United States' arguments would make mandatory the INA's voluntary scheme, eliminating the State's ability to "decline to administer the federal program." *New York*, 505 U.S. at 177. In doing so, it would prevent Colorado from "devot[ing] its attention and its resources to issues" the State has determined to be more pressing than assisting federal immigration authorities. *Id.* at 174. And the United States' position would "forc[e] [Colorado] to absorb the financial burden

of implementing" parts of the INA's regulatory scheme, *Printz*, 521 U.S. at 930, ignoring the Supreme Court's admonishment that the federal government may not "impress into its service—and at no cost to itself—the police officers of the 50 states." *Id.* at 922.

The United States counters that federal laws requiring the expenditure of state resources do not always raise commandeering problems. Op. Br. 25–26. But this is not an instance in which compliance with generally applicable federal requirements incidentally imposes costs on a State. Instead, the United States claims the power to require States and their political subdivisions, uniquely, to detain noncitizens for immigration purposes and to otherwise assist with federal immigration enforcement. As a result, this case is unlike *Reno v. Condon*, 528 U.S. 141 (2000), in which the Supreme Court upheld a federal law that "applied equally to state and private actors" but "did not regulate the States' sovereign authority to 'regulate their own citizens.'" *Murphy*, 584 U.S. at 476 (discussing *Condon*). It is also unlike *United States v. King County*, 122 F.4th 740 (9th Cir. 2024). There, the Ninth Circuit found no commandeering problem in requiring a county to provide entities assisting with immigration enforcement "non-

discriminatory access to county property," where there was "no indication that the federal government ha[d] ordered [the county] to provide [it with] additional support." *Id.* at 758.

Courts have consistently identified the anticommandeering problems raised by the United States' sweeping interpretation of the INA. For example, the Ninth Circuit reasoned that "[e]xtending conflict or obstacle preemption to [analogous California laws] would, in effect, 'dictate[] what a state legislature may and may not do,' because it would imply that a state's otherwise lawful decision *not* to assist federal authorities is made unlawful when it is codified as state law." *Id.* at 890 (quoting *Murphy*, 584 U.S. at 474). Other circuits and courts have concluded similarly. *See Galarza*, 745 F.3d at 643–45; *City of El Cenizo*, 890 F.3d at 178; *see also County of Ocean v. Grewal,* 475 F. Supp. 3d 355, 379–83 (D.N.J. 2020); *United States v. New York*, 814 F. Supp. 3d 266, 278–79 (N.D.N.Y. 2025), *Illinois*, 796 F. Supp. 3d at 531–32; *United States v. New Jersey*, No. 3:26-cv-01770, 2026 WL 2621025, at *11–12 (D.N.J., Sept. 4, 2026).

The United States generally argues that the anticommandeering principle is not implicated because Colorado's Anticommandeering

Laws "deliberately obstruct," or "interfere" with the federal government's administration of its own programs. *See e.g.*, Op. Br. 1–3, 9, 23–24. But the Anticommandeering Laws do no such thing. Properly read, the laws regulate the use of Colorado's state and local resources and limit the circumstances under which these resources may be used to support civil immigration enforcement.[4] There is no "obstruction" where, as here, the challenged laws leave federal authorities free to perform their own enforcement work using their own resources and instead restrict assistance by state and local officials. Again, "refusing to help is not the same as impeding." *California*, 921 F.3d at 888 (citation omitted); *see also Colorado v. U.S. Dep't of Just.,* 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020) ("[T]here is an important difference between actively interfering and simply refraining from assisting with federal immigration enforcement.").

Nor can the United States avoid the anticommandeering rule by framing the INA as a "cooperative federalism" program. Op. Br. 24–25. Under cooperative federalism principles, "where Congress has the

[4] The District Court correctly adopted Colorado's interpretation of the Anticommandeering Laws. *See* Appx227–29; *see also* Appx44–45.

authority to regulate private activity under the Commerce Clause, [courts] have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 167. But States must "retain the ultimate decision as to whether or not the State will comply," or whether they will "choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program." *Id.* at 168. The INA contains nothing resembling this choice. Instead, the United States has pointed only to longstanding law *requiring* convicted noncitizens to serve out their incarceration before removal.[5] *See* 8 U.S.C. § 1231(a)(4); *contra* Op. Br. 1, 14, 29, 34.

---

[5] To the extent the United States suggests that States could choose not to subject noncitizens to criminal justice altogether, it offers no evidence that the INA reflects that policy. It is difficult to imagine Congress intended to invite States to forgo prosecuting noncitizens, given the INA's heavy reliance on those convictions for deportability. *E.g.*, 8 U.S.C. § 1227(a)(2). Moreover, this purported "choice" would be an extraordinary incursion on historic police powers. "[A]mong the basic sovereign prerogatives States retain" is authority over criminal-justice administration. *Oregon v. Ice*, 555 U.S. 160, 168 (2009); *see also Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) ("State prosecutions therefore have their most ancient roots in an 'inherent sovereignty' unconnected to, and indeed pre-existing, the U.S. Congress."). It would

The INA's actual scheme is also nothing like the one upheld in *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), on which the United States relies. Op. Br. 24–25. There, Congress required the federal government to comprehensively regulate coal mining operations but permitted States to administer their own regulatory regimes if they complied with minimum federal standards. *Hodel*, at 270–71, 289. If States did not wish to regulate consistent with federal standards, they could leave all regulation to the federal government, and States were not required to participate in the federal program. *See id.* at 288. The *Hodel* Court emphasized that this was consistent with standard preemption principles allowing Congress "to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law." *Id.* at 290. Here, the INA imposes no minimum standards, let alone gives States a choice to regulate consistent with those minimum standards. The challenged state laws regulate state resources, not private actors. And the INA regulates immigration and deportation, which the States

---

likewise raise serious equal-protection concerns if noncitizens were immunized from criminal prosecution.

do not. Cooperative federalism principles are irrelevant. "*Hodel* is inapposite." *California*, 921 F.3d at 889 n.15.

Similarly, the United States notes that Congress can indirectly restrict the activities of state and local employees by passing federal regulations of private actors that preempt conflicting state regulation. Op. Br. 27–28. But this is not a case where Colorado and Congress have passed conflicting regulations of private actors, and the United States' cited cases are readily distinguishable.

In *United States v. Locke*, the Supreme Court held preempted state laws that imposed requirements on oil tanker crews. 529 U.S. 89, 112–14 (2000). This was a straightforward example of preemption, in which "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence." *Murphy*, 584 U.S. at 477. Here, by contrast, Colorado has not conferred rights or imposed restrictions on private parties in conflict with federal regulation; it has imposed restrictions and obligations on its own agencies, officials, and political subdivisions, and the United States claims the right to override those choices.

And in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), a State banned private parties doing business with Burma from state procurement contracts, in conflict with federal sanctions and in a manner that undermined the President's ability to pursue effective diplomacy. In addition to significant international relations concerns, the State and federal government sought to impose conflicting restrictions on private entities doing business with or in Burma. *Id.* at 367–68. Thus, those conflicting laws could be "best read as . . . regulat[ing] private actors." *See Murphy*, 584 U.S. at 477. Not so here.

At bottom, the United States misses the key distinction at the heart of the anticommandeering doctrine. While States may be subject to federal laws when "applied equally to state and private actors," *Murphy*, 584 U.S. at 475–76, the United States does not rely on any generally applicable laws that equally regulate private actors. Instead, it seeks, through the backdoor of obstacle preemption, to directly regulate States qua States—arguing that the INA directly limits States and political subdivisions, requiring them uniquely to provide assistance to administer a federal program in ways not required from private actors. This does not threaten wide swaths of Supremacy Clause

jurisprudence or generally applicable criminal laws. Op. Br. at 26–28. Here, the federal government is merely prevented from directly regulating States by forcing States to assist with immigration enforcement in ways not required of private actors. That is the result the Constitution commands.[6] *Murphy*, 584 U.S. at 471.

### C. The Anticommandeering Laws are not expressly preempted.

The United States also claims that a narrow set of information-sharing limitations within the Anticommandeering Laws are expressly preempted by 8 U.S.C. §§ 1373 and 1644. These arguments fare no better because there is no conflict between the challenged provisions and federal law—indeed, many of the challenged provisions expressly

---

[6] The United States separately argues that invalidating the two inaccurately described "tipoff" provisions cannot constitute commandeering because that would not require Colorado to expend any resources. Op. Br. at 26. Not so. The anticommandeering doctrine also prevents directly "dictat[ing] what a state legislature may and may not do." *Murphy*, 584 U.S. at 474. Here, the United States seeks to prevent the General Assembly from requiring public entities to adopt policies (without even specifying the content of those policies) or from conditioning the State's agreement to facilitate interviews between immigration authorities and prisoners on its own facilitators providing notice of basic rights. This is not an instance of the federal government and Colorado subjecting private actors to conflicting regulations. These are not valid preemption provisions, but rather unlawful commands to the state legislature that would violate the Tenth Amendment.

require compliance with federal law—and because sections 1373 and 1644 cannot validly preempt state law.

### 1. There is no conflict between the information-sharing provisions and sections 1373 and 1644.

Section 1373 provides that state and local governments may not "prohibit, or in any way restrict, any government entity or official from sending to . . . the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see also id.* § 1644.[7] Because the Anticommandeering Laws' information-sharing provisions do not conflict with that prohibition, they are not expressly preempted.

The first information-sharing provision, C.R.S. § 24-74-103(1), restricts state and local employees from disclosing to anyone for immigration enforcement purposes an individual's "personal identifying information that is not publicly available." *Id.* The second provision, C.R.S. § 24-72-204(7)(b)(I), similarly limits sharing driver's license and automobile registration information for immigration enforcement

[7] Though written in the passive voice, Section 1644's scope is identical to section 1373(a). The United States does not argue that any differences between sections 1373(a) and 1644 are material.

purposes. Both provisions expressly contain a carve-out allowing information to be shared "as required by federal or state law." *Id.* §§ 24-74-103(1), 24-72-204(7)(b)(I). Because these provisions allow sharing information as required by federal law, including sections 1373 and 1644, by definition there is no conflict. *See, e.g.*, *California*, 921 F.3d at 891 (no conflict with state law containing carve-out permitting information-sharing to the extent required by § 1373).

The United States acknowledges the express carve-outs for compliance with federal law but nevertheless contends the Court should ignore them because these laws purportedly adopt an "improperly narrow interpretation" of sections 1373 and 1644. Op. Br. 38. But neither provision adopts any interpretation of any federal law; they just contain a blanket exception "as required by federal or state law." C.R.S. §§ 24-74-103(1), 24-72-204(7)(b)(I). The United States cannot point to any case where a law with an express carve-out for compliance with federal law was held *facially* invalid as expressly preempted. The Court should reject this counterintuitive argument.

The last challenged restriction on information-sharing, C.R.S. § 24-76.6-103, prevents probation and pretrial services staff from

sharing a narrower range of information. It prohibits the sharing of "personal information about an individual," *id.* § 24-76.6-103(1)(a), "including but not limited to home or work contact information; family or emergency contact information; probation meeting date and time; community corrections locations; community corrections meeting date and time; or the meeting date and time for criminal court-ordered classes, treatment, and appointments," *id.* § 24-76.6-101(4). Critically here, it does not encompass information regarding citizenship or immigration status and thus does not implicate sections 1373 and 1644.[8] Since it does not fall within the scope of those provisions, there is

---

[8] While the statute's enumerated examples of "personal information" are nonexclusive, all the listed examples relate to means of locating a person; none relates to identifying characteristics about an individual such as race, gender, nationality, or citizenship status. Thus, under the cannon of "noscitur a sociis," the probation provision is most naturally read as applying only to the exchange of location-related information. *Cf. Yates v. United States*, 574 U.S. 528, 544 (2015) (applying this canon to conclude that the term "tangible object" in a list of terms beginning with "any record [or] document" was "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents"); *Coloradans for a Better Future v. Campaign Integrity Watchdog*, 409 P.3d 350, 356 (Colo. 2018) ("[B]ecause the General Assembly deposited the word 'gift' among monetary terms, we infer that it meant monetary gift."). The United States does not contest Colorado's interpretation of its law on appeal. *See* Op. Br. 35–38.

no express preemption. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010).

Resisting this straightforward conclusion, the United States urges that the phrase "information regarding the citizenship or immigration status" of an individual, in sections 1373 and 1644, should be read broadly to mean *any* "facts that bear on an individual's citizenship or immigration status," no matter how attenuated the connection—including "information like an alien's release date from state or local custody or home address." Op. Br. 36–37. This Court should join the many other courts that have rejected the United States' atextual interpretation. *E.g.*, *Illinois*, 796 F. Supp. 3d at 516 ("Without exception, each [other court that has considered the issue] has rejected the United States's capacious reading of § 1373."); *California*, 921 F.3d at 891; *Grewal*, 475 F. Supp. 3d at 373–76; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 332–33 (E.D. Pa. 2018), *vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019).

The plain meaning of "information regarding . . . citizenship or immigration status" relates to whether a person is a citizen and the nature of their immigration status. *See California*, 921 F.3d at 891

(phrase is "naturally understood as a reference to a person's legal classification under federal law"). Congress chose to focus the statute specifically on "citizenship or immigration status," emphasizing this point by adding a further clause "lawful or unlawful." 8 U.S.C. §§ 1373(a), 1644. Surely, if Congress intended to cover all sorts of other information, it would have said so more directly. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 262 (1994) (refusing "to assume that Congress chose a surprisingly indirect route to convey an important and easily expressed message"). While a term like "regarding" or "related to" "generally has a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018), and thus may encompass some narrow universe beyond the mere fact of a person's citizenship or immigration status, it does not override the statutory focus on "citizenship or immigration status." This is especially so because the United States seeks to preempt historic state police powers, which requires showing "that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. It does not come close to that heavy burden.

The United States' interpretation is untethered from the text. If accepted, it could cover wide swaths of information based on the most tangential links. The United States argues, for example, that the statute encompasses "release date" because a person cannot be deported until first released from custody, and "home address" because failure to properly update one's new home address can hypothetically lead to removal. Op. Br. 37. But the United States offers no limiting principle to cabin such daisy chains of associations. "[I]f the term 'regarding' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally, relations stop nowhere." *California*, 921 F.3d at 892 (citation modified). For that reason, in analogous circumstances, the Supreme Court rejected a party's attempt to similarly expand the scope of preemption based on the term "relate to." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). And even under its expansive reading, the United States offers no explanation as to how information like "emergency contact information" or "community corrections locations" could plausibly bear

on a person's immigration status, so as to justify the law's facial invalidation.

At bottom, if Congress had intended to cover any information about a noncitizen, it would have said so. Indeed, "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *California*, 921 F.3d at 892 (citing, for example, 8 U.S.C. § 1360(b)'s reference to "information in any records kept by any department or agency of the Government as to the identity and location of aliens in the United States"); *see also* 8 U.S.C. § 1367(a)(2) (forbidding disclosure of "any information which relates to an alien"). Congress "certainly could have added" language of this sort, "but it did not." *Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1164 (2019).

Nor does it matter that section 1373(a) uses "regarding" while section 1373(c) does not. Op. Br. 36. Courts have repeatedly rejected this argument, noting that the two subsections are structured slightly differently. The minor semantic differences do not support *vastly* different scopes; to the contrary, they emphasize the statute's narrow

focus on citizenship and immigration status, not other information. *Illinois*, 796 F. Supp. 3d at 517–18; *California*, 921 F.3d at 892.

Finally, because the United States' interpretation is foreclosed by the statute's plain language, there is no basis for consulting the legislative history. *See, e.g.*, *Steinle*, 919 F.3d at 1164 & n.11 (observing that "the plain and unambiguous statutory text simply does not accomplish what the Conference Report says it was designed to accomplish"). In any event, as numerous courts have recognized, the congressional report on which the United States relies, Op. Br. 36–37, itself indicates that "information regarding the immigration status" and the "presence, whereabouts, or activities of illegal aliens" are two distinct, "non-overlapping" categories. *California*, 921 F.3d at 892 n.18 (discussing H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.)); *Illinois*, 796 F. Supp. 3d at 518 (same). This same report also inaccurately asserts that the prohibition extends, for example, to any "decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS." H.R. Rep. No. 104-725, at 383. Nothing in the statute covers that scope, causing serious reliability concerns.

The cited report language raises further questions because it is located in the wrong portion of the report dedicated to a different subtitle and section of the Act concerning other matters. *Compare* H.R. Rep. No. 104-725, at 383 *with id.* at 391. Within the correct subtitle and section, there is a *different* explanation making clear that this enacted section was directed at sharing immigration status, not other information. *Id.* at 391. This only leads to speculation about the messy legislative process: "[l]egislation is, after all, the art of compromise." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017); *see also Blanchard v. Bergeron*, 489 U.S. 87, 98 (1989) (Scalia, J., concurring) (describing issues with relying on such reports). None of that speculation matters because "Congress's 'authoritative statement is the statutory text, not the legislative history.'" *Whiting*, 563 U.S. at 599 (citation omitted).

The Court should reject the United States' anti-textual, overbroad reading of sections 1373 and 1644. Once properly understood, there is no conflict between federal and state law and thus no express preemption.

### 2. Sections 1373 and 1644 cannot preempt the Anticommandeering Laws.

Even if there were a conflict, the United States' express preemption claim would fail. Sections 1373 and 1644 are not valid preemption provisions because they regulate States, not private actors. *See Ocean Cnty. Bd. of Comm'rs v. Att'y Gen.*, 8 F.4th 176, 181–82 (3d Cir. 2021). Congress has "the power to regulate individuals, not States." *Murphy*, 584 U.S. at 477 (citation omitted). As a result, for a federal statute to validly preempt state law, it "must be best read as one that regulates private actors." *Id.* Sections 1373 and 1644 fail that test, as they both "unequivocally dictate[] what a state legislature may and may not do," *id.* at 474, and their regulatory target is unquestionably state and local governments, not private actors. A State "may not prohibit, or in any way restrict, any government entity or official." 8 U.S.C. § 1373(a); *id.* § 1644 (same). There is no way to read this provision as regulating private actors because it does not "impose[] restrictions or confer[] rights on private actors." *Murphy*, 584 U.S. at 477.

For this reason, courts addressing this issue have repeatedly held that these provisions lack preemptive force. *Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 181–82; *City of Chicago v. Sessions*, 321 F. Supp.

3d 855, 866–73 (N.D. Ill. 2018); *Oregon v. Trump*, 406 F. Supp. 3d 940, 971–73 (D. Or. 2019), *vacated as moot sub nom. City & County of San Francisco v. Garland*, 42 F.4th 1078, 1087–88 (9th Cir. 2022); *Philadelphia*, 309 F. Supp. 3d at 325–31.

The United States points to the INA as a whole, observing that it elsewhere regulates private actors. Op. Br. 30. But as the Supreme Court has made clear, the focus must be on the statutory provision alleged to preempt state law, not other provisions in same statutory scheme. *Murphy*, 584 U.S. at 479–80 (holding irrelevant that "a closely related provision of [the same Act] *does* restrict private conduct" because "that is not the provision challenged"). For the same reason, the United States cannot claim that the challenged provisions of the Anticommandeering Laws regulate private actors by "subjecting them to the State . . . criminal-justice system[]," Op. Br. 30. Colorado's criminal laws are located in entirely different portions of the Colorado Revised Statutes.

Moreover, the INA provisions the United States characterizes as regulating private actors are better understood as directing the actions of federal officers; they direct those federal officers whom to "take into

custody," 8 U.S.C. § 1226(c)(1), to "detain," *id.* § 1231(a)(2)(A), and to "remove," *id.* § 1231(a)(1)(A), (4)(A), as well as when to do so. In so instructing federal officials how to perform their duties, they do no "confer any federal rights" on private actors or "impose any federal restrictions on [them]." *Murphy*, 584 U.S. at 480.

Even assuming, *arguendo*, that the federal provisions could be read as regulating private actors, the Anticommandeering Laws' information-sharing restrictions cannot, as they limit *state officials'* ability to disclose certain private information. *See*, *e.g.*, C.R.S. § 24-74-103 (mandating that "state agency employee[s] or political subdivision employee[s]" cannot disclose certain information). The challenged provisions thus neither "confer[] rights" nor "impose[] restrictions" on private actors that are "inconsistent—*i.e.*, in conflict—with" those imposed by "federal law." *Murphy*, 584 U.S. at 477–78.

#### 3. The United States' position raises constitutional concerns.

Finally, like its obstacle preemption claim, the United States' express preemption arguments fail because it seeks unconstitutionally to commandeer Colorado. Accepting the United States' argument would allow it to wrest control from state and local governments over the

scope of their employees' job duties and whether they must spend official time and resources responding to immigration authorities' information requests. Section 1373 also seeks to "dictate[] what a state legislature may and may not do," in violation of anticommandeering principles. *Murphy*, 584 U.S. at 474.

The United States argues that the Tenth Amendment is not implicated where States are required only to "share information with the Federal Government." Op. Br. 32 (alterations omitted).[9] But the Supreme Court has never held that there is an "information-sharing"

---

[9] The United States also relies on a Second Circuit case that predates and was later undermined by the Supreme Court's decision in *Murphy*. In *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), the Second Circuit declined to hold that sections 1373 and 1644 violated the Tenth Amendment on the basis that those laws did not "compel[]" or "conscript[]" States into enacting a federal program instead merely prohibited them. 179 F.3d at 35. But *Murphy* rejected as "empty" any distinction between federal laws that "command[] 'affirmative' action" by a State "as opposed to imposing a prohibition." 584 U.S. at 475. Numerous courts have correctly recognized that *City of New York* cannot survive *Murphy*. *See, e.g.*, *Chicago*, 321 F. Supp. 3d at 873; *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018); *United States v. City of New York*, No. 1:24-cv-04084, 2026 WL 3083753, at *9 (E.D.N.Y. Oct. 15, 2026). A later Second Circuit case recognized *Murphy* may have undermined its prior reasoning, though it questioned without deciding whether that meant section 1373 is facially unconstitutional. *See New York v. U.S. Dep't of Just.*, 951 F.3d 84, 112–16 (2d Cir. 2020).

exception to Tenth Amendment principles. In *Printz*'s discussion of historical practices that shed light on the Tenth Amendment's scope, the Court noted the existence of recently enacted federal statutes that "require[d] only the provision of information to the Federal Government," which did "not involve the precise issue before [the Court] [t]here." 521 U.S. at 917–18. The Court did not address such laws' constitutionality, instead concluding that they were too recent to be probative of the Constitution's historical meaning. *Id.* at 918.

While *Condon* upheld a federal statute that "regulate[d] the States as the owners of data bases," 528 U.S. at 151, the Supreme Court later made clear that "the basis for the Court's decision in *Reno v. Condon*" was not the fact that it involved information-sharing, but rather that the law at issue "applied equally to state and private actors," because "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Murphy*, 584 U.S. at 475–76. Here, by contrast, the challenged provisions target exclusively state actors, requiring them to assist with a federal program. *See California*, 921 F.3d at 890 (rejecting *Condon* as irrelevant to whether federal law could

validly preempt state law "govern[ing] the exchange of information with federal immigration authorities," because it was "the state's responsibility to help enforce federal law, and not conduct engaged in by both state and private actors, that [wa]s at issue" (citation omitted)).

Since *Printz*, courts have repeatedly rejected the United States' requests to recognize an information-sharing exception. *See, e.g.*, *Chicago*, 321 F. Supp. 3d at 870–73; *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 952–53 (N.D. Cal. 2018), *aff'd in part, vacated in part*, 965 F.3d 753 (9th Cir. 2020); *Oregon*, 406 F. Supp. 3d at 973. This Court should follow. An information-sharing exception would enable the federal government to commandeer an army of state and local employees—shifting employee time and imposing costs—to extract information covering the vast array of fields in which States exercise regulatory authority. That is not consistent with the fundamental principles of the anticommandeering doctrine. *Murphy*, 584 U.S. at 473 (the anticommandeering rule applies "not only to state officers with policymaking responsibility but also to those assigned more mundane tasks").

The United States' express preemption claim was properly dismissed.

## II. The Court should affirm the dismissal of the intergovernmental immunity claims.

The United States also argues that the Anticommandeering Laws violate intergovernmental immunity principles. Op. Br. 38–39. Because the Anticommandeering Laws do not discriminate against the federal government, the Court should affirm.[10]

### A. The Anticommandeering Laws do not discriminate against the federal government.

Under the intergovernmental immunity doctrine, a State may not "discriminat[e] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022). However, such discrimination occurs only if a State "treats someone else better than it treats" the federal government related to their governmental status. *Washington v. United States*, 460 U.S. 536, 545–46 (1983). Such "[d]ifferential treatment is critical to a discrimination-based

---

[10] The United States also alleged unlawful regulation of the federal government. Appx38, 166. That claim is waived because it was not raised in the United States' opening brief. *City of Colorado Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009).

intergovernmental immunity claim," and the United States' claim fails because it is absent here. *McHenry Cnty.*, 44 F.4th at 594.

The Anticommandeering Laws represent a decision to limit state resources from being used for civil immigration enforcement. Those limits apply regardless of the identity of the party seeking such cooperation or assistance. Of course, civil immigration enforcement is a federal function. *See, e.g.*, *Arizona*, 567 U.S. at 394–95. But as other courts have explained in rejecting the United States' discrimination arguments, "[t]he mere fact that [the challenged law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594; *see also California,* 921 F.3d at 881 (intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment"); *New York*, 814 F. Supp. 3d at 283 (same); *Illinois*, 796 F. Supp. 3d at 533 (same).

The caselaw cited by the United States does not hold otherwise. Op. Br. 40–41. There, the laws in question were held unconstitutional because of express differential treatment, not because they covered an exclusive federal domain. *King Cnty.*, 122 F.4th at 757 (finding

challenged county executive order "'explicitly treats' contractors who serve ICE charter flights 'differently' from those [contractors] who do not"); *California*, 921 F.3d at 882 (finding challenged provision unlawful not because it "relates exclusively to federal conduct"—as did other provisions the Court upheld—but because of the "vital distinction" that it "imposes a specialized burden on federal activity"). Indeed, it is odd that the United States would cite these Ninth Circuit cases as supporting its position when the Ninth Circuit has drawn the very distinction that it claims is wrong. *California*, 921 F.3d at 881.

There are no entities "'similarly situated' to the federal government that receive more favorable treatment" under the challenged laws. *McHenry Cnty.*, 44 F.4th at 594 (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality opinion)); *see also New York*, 810 F. Supp. 3d 329, 353 (rejecting similar discrimination claim because the "United States never identifies a comparator," even though "[t]he challenged policies certainly affect the federal government as the primary enforcer of civil immigration law"); *Illinois*, 796 F. Supp. 3d at 533 (same); *United States v. New Jersey*, No. 20-cv-01364, 2021 WL 252270, at *14 (D.N.J. Jan. 26, 2021) (same); *California*, 314 F.

Supp. 3d at 1111 (same). The United States appears to have abandoned its argument below that it is "unnecessary . . . to identify a comparator," Appx.163, and instead argues that the appropriate comparator is state and local law enforcement agencies or officials. Op. Br. 39–40. But these entities and officials are not actually treated any differently. State and local law enforcement simply do not often participate in civil immigration enforcement. "Local and state law enforcement officials are therefore not similarly situated for comparator purposes." *New Jersey*, 2026 WL 2621025, at *14.

Put differently, the object of Colorado's law is civil immigration enforcement; it does not single out the federal government for less favorable treatment based on its federal government status. If state or local law enforcement officers engage in civil immigration enforcement, the challenged Anticommandeering Laws apply equally to them. The United States highlights C.R.S. § 24-72-204(7)(b)(I) as the example supporting its discrimination claim, Op. Br. 40, but it actually proves the opposite. Under this provision, if a state or local law enforcement officer were to request covered information "for the purpose of" immigration enforcement, the statute would prohibit disclosure to them

just as it would to a federal officer. C.R.S. § 24-72-204(7)(b)(I) (authorizing release of information to federal, state, or local law enforcement unless the purpose of the request is civil immigration enforcement). Colorado's choice to limit use of its resources for civil immigration enforcement applies categorically to all and does not unlawfully discriminate against the federal government.

Nor do the inaccurately described "tipoff provisions" constitute unlawful discrimination. Op. Br. 39 (citing C.R.S. §§ 24-76.6-103(2) and 24-74.1-102(3)(a)(VII)). In *California*, the federal government challenged a state law *requiring* private employers to give employees advanced notice of immigration inspections. 921 F.3d at 875. The Ninth Circuit held this did not violate intergovernmental immunity because "the mere fact that the actions of the federal government are incidentally *targeted* by [a challenged law] does not mean that they are incidentally *burdened*, and while the latter scenario might implicate intergovernmental immunity, the former does not." *Id.* at 880. So too here. Neither provision "directly or indirectly affect[s] the operation of a federal program" or "burden[s]" any federal action. *Id.*

As discussed *supra* at 10, 30–31, C.R.S. § 24-74.1-102(3)(a)(VII) requires certain public entities to adopt a policy regarding communicating information about immigration requests "as appropriate." This narrow statute does not dictate the policies' content, nor require any notifications. It does not implicate intergovernmental immunity because it does not limit federal authorities' abilities to make any requests nor burden any federal actions. The United States' reliance on C.R.S. § 24-76.6-103(2) is even more puzzling. That provision permits state and local law enforcement to cooperate with immigration authorities in facilitating interviews with incarcerated individuals. Though not required by law, Colorado agreed to allow facilitation but requires its own facilitators to provide incarcerated individuals with basic information about their rights, such as the right to speak to an attorney. *Id.* § 24-76.6-103(2). This again does not burden any federal actions or implicate intergovernmental immunity; to the contrary, it permits cooperation and assistance with immigration authorities not required by law.

### B. Accepting the federal government's discrimination theory would raise serious constitutional concerns.

The United States' discrimination theory fails for the independent reason that the Tenth Amendment protects Colorado's authority to enact laws declining to provide state resources for a federal regulatory program. As discussed *supra* Sections I.B.2, I.C.2–3, the federal government may not compel states to "administer or enforce a federal regulatory program," *Murphy*, 584 U.S. at 473. Accepting the United States's arguments "would imply that [a State] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891 (rejecting a discrimination claim against an analogous California law).

There is no dispute that States have sovereign authority over their limited law enforcement resources and can allocate or decline to utilize those resources in particular areas of law enforcement. But according to the federal government's theory, States lose that authority if they decline to dedicate their law enforcement resources to areas that

are subject to purely federal regulation, because doing so would be discriminatory. This turns the anticommandeering doctrine on its head.

Courts addressing this issue have repeatedly concluded that state laws effectuating a choice not to assist in immigration enforcement are not discriminatory and that finding otherwise would be contrary to the Tenth Amendment. *See, e.g.*, *California*, 921 F.3d at 891; *New York*, 810 F. Supp. 3d at 355; *New Jersey*, 2021 WL 252270, at *13; *New Jersey*, 2026 WL 2621025, at * 14 n.2. Indeed, the United States cites no case that has ever found a state law effectuating a State's decision not to participate in a federal program invalid on immunity grounds.

### III. In any event, the Colorado General Assembly is not a proper defendant.

Regardless, the Court should affirm the dismissal of the Colorado General Assembly. The General Assembly is a legislative body vested with legislative power and does not possess executive power to administer or execute the laws it enacts. Colo. Const. arts. III, V; *Mac Manus v. Love*, 179 Colo. 218, 221–22 (1972). Because the General Assembly lacks any enforcement authority, the United States lacks standing to sue it. *Bronson v. Swensen*, 500 F.3d 1099, 1110–11 (10th Cir. 2007) (holding that the causation and redressability prongs are not

met when “a plaintiff seeks relief against a defendant with no power to enforce a challenged statute”). This is consistent with foundational principles of judicial review that “[w]hen a plaintiff alleges injury by unconstitutional action taken pursuant to a statute, his proper defendants are those acting unconstitutionally under the law . . . and not the legislature which enacted the statute.” *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 879 n.6 (D.C. Cir. 1981).

Even when confronted with this fact, the United States persisted, claiming that the General Assembly was a proper party “[g]iven its past and continued passing of unconstitutional legislation.” Appx173. This simply reinforces the United States’ true goal: to dictate “what [the] state legislature may and may not do,” *Murphy*, 584 U.S. at 474, and to enjoin the General Assembly, under threat of contempt, to intimidate it from passing laws the federal government dislikes. Permitting such a claim would be “as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals.” *Id.* The United States’ actions fly in the face of the anticommandeering doctrine.

On appeal, the United States offers no argument defending including the General Assembly as a party. The Court should affirm the dismissal.

## IV. The Court should decline to adopt the federal government's proposed relief.

The Court should affirm for the reasons explained above. But regardless, the Court should reject the United States' proposal that it first address the District Court's Tenth Amendment analysis and then remand for the District Court to evaluate the preemption and discrimination claims. Op. Br. 3.

First, this gets the order of operations backwards and violates constitutional avoidance principles. For example, if there is no conflict and no preemption, then there is no need to address the Tenth Amendment. Preemption and discrimination should be addressed first.

Second, this erroneously assumes that the District Court did not address the merits of the preemption and discrimination claims when it stated that it did. Appx237. The Court fully "adopt[ed] the analysis of reasoning" of the *Illinois* and *New York* decisions, referencing the specific conclusions that there was "no express or implied preemption," and no intergovernmental immunity violation. *Id.* The United States

also repeatedly speculates that the District Court ignored its arguments below or chose not to engage in required analysis. *See e.g.*, Op. Br. 14, 22, 34. The Court should decline these invitations to speculate. To the extent more explanation is necessary or helpful, the Court should order a limited remand, while retaining jurisdiction, to allow the District Court to more fully explain its reasoning. *See e.g. Seeley v. Chase*, 443 F.3d 1290, 1293 (10th Cir. 2006); 16 Fed. Prac. & Proc. Juris. § 3937.1, Retained Jurisdiction (3d ed. updated 2026) ("[C]ourts of appeal often have retained jurisdiction while making a limited remand for additional findings or explanations.").

Third, this ignores that the United States only addressed parts of the dismissal. In its Opening Brief, the United States does not address the direct regulation or field preemption claims, nor does it address many portions of the Anticommandeering Laws. Any arguments regarding these claims are waived, and the dismissal of these claims should be affirmed.

## CONCLUSION

The Court should affirm the District Court's order and judgment of dismissal.

Dated: November 10, 2026

Respectfully submitted,

PHILIP J. WEISER
Attorney General of Colorado

DAVID MOSKOWITZ
Deputy Solicitor General
TALIA KRAEMER
Assistant Solicitor General
SAM WOLTER
Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000

*Counsel for State of Colorado, Governor Jared Polis, and Attorney General Philip J. Weiser*

MATHA M. TIERNEY
Tierney Lawrence Stiles LLC
225 E. 16th Avenue, Suite #350
Denver, CO 80203
Telephone: (303) 356-4870

*Counsel for the Colorado General Assembly*

## STATEMENT REGARDING ORAL ARGUMENT

This case raises complex preemption questions as well as important limitations on federal authority to command States to assist with immigration enforcement. Colorado Appellees request oral argument.

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) [no more than 13,000 words].

☒ This document contains 12,952 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6):

☒ This document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type.

This document has been submitted in compliance with the court's ECF requirements.

/s/ *David Moskowitz*
David Moskowitz
Attorney for Appellees
1300 Broadway, 10th Floor
Denver, Colorado 80203
Email: David.Moskowitz@coag.gov
Telephone: 720-508-6000